## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM A. CHAMBERS; JOSEPH B. CHAMBERS; JEANNE C. FAUX; BARBARA C. HENNING; DANIEL LOREN DAY; LORI A. DAY; SAMANTHA SCHOLZ; JOHN D. WITTER; AND RICHARD W. WITTER | JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | CASE NO. 3:18-cv-437-ARC |
| CHESAPEAKE APPALACHIA, L.L.C. and EQUINOR USA ONSHORE PROPERTIES, INC. f/k/a STATOIL USA ONSHORE PROPERTIES, INC. | (Judge A. Richard Caputo) |
| Defendants. | |

## **SECOND AMENDED COMPLAINT**

Plaintiffs William A. Chambers, Joseph B. Chambers, Jeanne C. Faux,

Barbara C. Henning, Daniel Loren Day, Lori A. Day, Samantha Scholz, John D.

Witter, and Richard W. Witter ("Plaintiffs") bring these claims against Chesapeake

Appalachia, L.L.C. ("Chesapeake") and Equinor USA Onshore Properties, Inc.

f/k/a Statoil USA Onshore Properties, Inc. ("Equinor").  Chesapeake and Equinor

are collectively referred to as "Defendants."

1

## NATURE OF THE SUIT

1.      This is an action seeking damages and specific performance or termination of Plaintiffs' oil and gas leases for Chesapeake's and Equinor's breaches of Plaintiffs' oil and gas leases (the "Leases").

2.      Plaintiffs are entitled to damages and specific performance or lease termination because Defendants materially breached the requirements of the Leases.  Defendants breached the Leases in four significant respects.

3.      First, with regard to John D. Witter, Richard W. Witter, William A. Chambers, Joseph B. Chambers, Jeanne C. Faux, and Barbara C. Henning,[1] Defendants breached the Leases' minimum well density clauses and the related unitization clauses by pooling the leasehold property into a production unit and then failing to maintain the required ratio of wells to unit acres pursuant to the well-density provisions.  The Leases require that when any acreage under the Leases is unitized, there must be a minimum well-density ratio of one well per 160 acres in a unit.  The unit Defendants created is 300 acres but has only one well, which is a ratio of one well per 300 acres.  These Plaintiffs have the "160 Acre Well Density Breach" claim against Chesapeake and Equinor, described further below.

---

[1] The remaining Plaintiffs (Ms. Scholz and the Days) have leases in which the lessors agreed with Chesapeake and Equinor in 2010 to amend the unitization clause to eliminate the well density requirement.

4.      Second, because Defendants failed to satisfy the well density and unitization clauses of the Leases of the 160 Acre Well Density claim Plaintiffs, Defendants breached the habendum clause of those Leases.  Defendants failed to properly unitize those Plaintiffs' properties and, as explained below, Defendants failed to produce gas "on the premises" as required by the habendum clauses in the Leases.

5.      Third, Chesapeake ignored the express prohibition in Plaintiffs' Leases on deducting post-production costs from Plaintiffs' royalty payments.  All Plaintiffs' leases were amended at the time of signing to remove language that might otherwise have permitted a lessor to take deductions for post-production expenses.   Notwithstanding the Leases' prohibition on post-production cost deductions, Chesapeake assessed deductions for post-production costs against royalties it paid to Plaintiffs.

6.      The royalty payment portion of the Leases originally read as follows:

> To pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marketed and used less or net any post production costs paid by the Lessee to prepare for and/or deliver the oil, gas, and/or coalbed methane gas for sale, including charges for gathering, transportation, dehydration, extraction of products and compression paid by Lessee to

3

deliver the oil, gas, and/or coalbed methane gas for sale. Payment of royalty for oil, gas, and/or coalbed methane gas marketed during any calendar month to be on or about the 60th day after receipt of such funds by the Lessee.

7.      At the time of signing, the parties amended the Leases by striking the language allowing deduction of post-production costs as follows:

To pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marketed and used ~~less or net any post production costs paid by the Lessee to prepare for and/or deliver the oil, gas, and/or coalbed methane gas for sale, including charges for gathering, transportation, dehydration, extraction of products and compression paid by Lessee to deliver the oil, gas, and/or coalbed methane gas for sale.~~ Payment of royalty for oil, gas, and/or coalbed methane gas marketed during any calendar month to be on or about the 60th day after receipt of such funds by the Lessee.

8.      Despite the language disallowing deductions for post-production costs and despite agreeing with the Plaintiffs that the modified lease language prohibited Chesapeake from taking deductions for post-production costs, Chesapeake has breached the Leases, insisting on deducting post-production costs from Plaintiffs' royalty payments.

9.      Finally, Equinor breached the royalty payment term of the Leases with regard to all Plaintiffs.  Equinor breached the Leases by calculating

royalties based on artificial prices Equinor assigned to transfers of Plaintiffs' gas to Equinor's marketing affiliate at the wellhead.  Instead of using actual downstream sales of the gas to unaffiliated third parties as the basis for determining royalties— as required by the Leases' royalty payment term—Equinor uses the artificial transfer price to cut the Plaintiffs out of the profits it makes for its parent company on those downstream sales.

10.    In addition to improperly using affiliate transfers at the wellhead instead of downstream sales to determine royalties, Equinor has based the artificial transfer price on prevailing prices at index hubs, not the ultimate locations where Equinor's affiliate markets the gas.  Equinor has manipulated its choice of index hubs, improperly switching from one to another to increase its profits at Plaintiffs' expense, further damaging Plaintiffs.

11.    In light of the Defendants' violations of their duties and disregard of their obligations under Plaintiffs' Leases, Plaintiffs are entitled to compensatory damages and specific performance or lease termination.

## **THE PARTIES**

### **A.    Plaintiffs and Their Leases**

12.    Plaintiff William A. Chambers resides at 1021 Sugar Hollow Road, Tunkhannock, Pennsylvania 18657.

13.     Plaintiff Joseph B. Chambers Jr. resides at 1811 County Route 1, Oswego, New York 13126.

14.     Plaintiff Jeanne C. Faux resides at 1174 Sugar Hollow Road, Tunkhannock, Pennsylvania 18657.

15.     Plaintiff Barbara C. Henning resides at 1033 Sugar Hollow Road, Tunkhannock, Pennsylvania 18657.

16.     Plaintiffs William A. Chambers, Joseph B. Chambers Jr., Jeanne C. Faux, and Barbara C. Hennings are siblings and are referred to collectively as the "Chambers Plaintiffs."

17.     Plaintiffs Daniel Loren Day and Lori A. Day (the "Day Plaintiffs") reside at 628 Day Road, Mehoopany, Pennsylvania 18629.

18.     Plaintiff Samantha Scholz resides at 499 Grist Flat Road, Mehoopany, Pennsylvania 18629.

19.     Plaintiff John D. Witter resides at 143 Shovelhead Lane, Mehoopany, Pennsylvania 18629.

20.     Plaintiff Richard W. Witter resides at 185 Taurus Lane/Grist Flat Road, Mehoopany Township, Pennsylvania 18657.

21.     Plaintiffs Richard W. Witter and John D. Witter are referred to collectively as the "Witter Plaintiffs."

22.     On or about October 12, 2007, the Chambers Plaintiffs, as lessors, entered into an Oil and Gas Lease (the "Chambers Lease") with Magnum Land Services, LLC, a Michigan-based company ("Magnum").[2]  Chesapeake and Equinor now are the lessees under the Chambers Lease.  The Chambers Lease covers 301.1 acres.  29.19 of these acres are unitized in the Wootten North Unit, which is operated by Chesapeake.  A true and correct copy of the Chambers Lease is attached as Exhibit A-1.  The Wootten North Unit Declaration of Pooling and Unitization is attached as Exhibit B.

23.     On or about October 12, 2007, Plaintiff Richard Witter, as lessor, entered into an Oil and Gas Lease (the "Richard Witter Lease") with Magnum.  Chesapeake and Equinor now are the lessees under the Richard Witter Lease.  The Richard Witter Lease covers 229.29 acres.  1.66 of those acres are unitized in the Wootten North Unit.  *See* Ex. B.  A true and correct copy of the Richard Witter Lease is attached as Exhibit A-2.

24.     On or about October 12, 2007, Plaintiff John D. Witter, as lessor, entered into an Oil and Gas Lease (the "John Witter Lease") with Magnum.  Chesapeake and Equinor now are the lessees under the John Witter Lease.  The John Witter Lease covers 36.18 acres.  4.41 of those acres are unitized in the

_____

[2] In addition to being a co-lessor of the property involved in the Chambers Lease, Jeanne Faux and her husband, David Faux, are also lessors in a separate 2 acre lease that has identical provisions.  Defendants also purported to unitize the Fauxs' separate property in the Wootten North Unit.

7

Wootten North Unit.  *See* Ex. B.  A true and correct copy of the John Witter Lease is attached as Exhibit A-3.

25.     On or about October 12, 2007, Frank D. Scholz, deceased, as lessor, entered into an Oil and Gas Lease (the "Scholz Lease") with Magnum. Chesapeake and Equinor now are the lessees under the Scholz Lease.  The Scholz Lease covers 118 acres.  80.3 of these acres are unitized in the Wootten North Unit.  A true and correct copy of the Scholz Lease is attached as Exhibit A-4.

26.     Plaintiff Samantha Scholz, Frank D. Scholz's daughter, is the current holder of the lessor's interest under the Scholz Lease.

27.     On or about October 12, 2007, Plaintiff Daniel Loren Day, as lessor, entered into an Oil and Gas Lease (the "Day Lease") with Magnum. Chesapeake and Equinor now are the lessees under the Day Lease.  The Day Lease covers 180.5 acres.  18.87 of these acres are unitized in the Wootten North Unit.  A true and correct copy of the Day Lease is attached as Exhibit A-5.

## B.     <u>Defendants</u>

28.     Defendant Chesapeake Appalachia, L.L.C. is a subsidiary of Chesapeake Energy Corporation.  It is an Oklahoma limited liability company with a principal business address of 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.  Chesapeake regularly conducts business in Pennsylvania and holds title to oil and gas leases concerning property in Pennsylvania.

29.     Defendant Equinor USA Onshore Properties, Inc. f/k/a Statoil USA Onshore Properties Inc. is a Delaware Corporation with its principal place of business at 2103 City West Blvd., Suite 800, Houston, Texas 77042.  Equinor regularly conducts business in Pennsylvania and holds title to oil and gas leases concerning property in Pennsylvania.

## JURISDICTION AND VENUE

30.     This Court has original jurisdiction over this matter under 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiffs, on one hand, and Defendants, on the other, and the amount in controversy exceeds $75,000.

31.     This Court has personal jurisdiction over the Defendants pursuant to 42 Pa. C.S. § 5322.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  In addition, the property involved is located in this judicial district.

## FACTUAL BACKGROUND

### Defendants' Breaches of Plaintiffs' Oil and Gas Leases with the 160 Acre Well Density/Habendum Clause

33.     The Witter Plaintiffs and Chambers Plaintiffs have oil and gas leases that include language specifically requiring that, if their property is pooled with other properties to create a production unit, such a unit must have a minimum well density ratio of not less than one well per 160 acres of unitized land.  *See* Exs. A-1, ¶ 8, A-2, ¶ 8, & A-3, ¶ 8.  These leases will be referred to as the "160 Acre Minimum Well Density Leases."

34.     The 160 Acre Minimum Well Density Leases provide that they shall continue in full force and effect and "so much longer thereafter as oil, gas, and/or coalbed methane gas or their constituents are produced or capable of being produced *on the premises* in paying quantities, in the judgment of the Lessee, or as *the premises* shall be operated by the Lessee in the search for oil, gas, and/or coalbed methane gas . . . ."   160 Acre Minimum Well Density Leases, ¶ 2 (emphasis added).

35.     Paragraph 8 of the 160 Acre Minimum Well Density Leases defines the premises, in pertinent part, as follows:

> Lessor hereby grants to the Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form a [sic] oil, gas, and/or coalbed methane gas development unit of not more than 640 acres, or such larger unit as may be

required by state law or regulation for the purpose of drilling a well thereon and *Lessee shall be required to maintain a well density of at least 1 well per 160 acres contained in such unit.*

*See id.,* ¶ 8 (emphasis added).

36.     Defendants have breached their obligations under the 160 Acre Minimum Well Density Leases' unitization and well-spacing provisions by failing to meet the well density requirement that calls for the lessee to maintain a well density of at least one well per 160 acres.

37.     The 160 Acre Minimum Well Density Leases' well density provision requires that any unit larger than 160 acres would need to have at least two wells to maintain the required ratio of at least one well per 160 acres in a production unit.

38.     The Wootten North Unit is 300.347681 acres and has only one well, Wootten N Wyo 2H.  Therefore, the actual well-density in this unit is *one well per 300 acres*.

39.     The well density in the Wootten North Unit therefore does not meet the minimum well-density ratio requirement of at least one well per 160 acres.

40.     Defendants' breach is ongoing and Defendants have not offered to cure the breach.

## By Breaching the Unitization Clause, Defendants Also Breached the Leases' Habendum Clause Because Defendants Are Not Producing Gas "On the Premises"

41.     Defendants' breach of the 160 acre minimum well density and unitization clauses in the 160 Acre Minimum Well Density Leases also results in a breach of the Leases' habendum clauses.

42.     The 160 Acre Minimum Well Density Leases' habendum clauses provide that the Leases will continue after their primary term for "so much longer thereafter as oil, gas, and/or coalbed methane gas or their constituents are produced or are capable of being produced *on the premises* in paying quantities, in the judgment of the Lessee . . . ."  160 Acre Minimum Well Density Leases ¶ 2 (emphasis added).

43.     The unitization clause defines the term "premises" when Defendants unitize Plaintiffs' property and provides, in pertinent part: "Any well drilled on *said* development unit whether or not located on the leased premises, shall nevertheless be deemed to be located upon the leased premises within the meaning and for the provisions and covenants of this lease . . . ."  *Id.* ¶ 8 (emphasis added).

44.     Under Pennsylvania contract law, specific provisions govern general ones.

45.     The unitization clauses in the 160 Acre Minimum Well Density Leases are critical.  Under Pennsylvania law, a unitization clause is the *sole* source of a lessee's authority to pool a leasehold property with other properties to create production units.   "Under a typical oil and gas lease, absent government involvement, the lessee's only authority to unitize the leased premises with other lands is derived from the permission granted to the lessee by the lessor, expressed in the terms of the lease agreement."  *Neuhard v. Range Resources–Appalachia, LLC*, 29 F. Supp. 3d 461, 470 (M.D. Pa. 2014).

46.     By violating the well-density ratio requirement of the unitization clause, Defendants exceeded their unitization authority and, consequently, created invalid production units.

47.     Because the specific language of the unitization clause defines what constitutes production "on the premises" as that term is used in the rest of the 160 Acre Minimum Well Density Leases (including the habendum clause) and because Defendants failed to comply with the unitization clause's well-density ratio requirement, Defendants have not satisfied the habendum clause's requirement for production in paying quantities "on the premises" under the terms of the 160 Acre Minimum Well Density Leases.

48.     Thus, Defendants' violation of the unitization clause's well-density ratio requirement means Defendants also failed to comply with the plain

language of the habendum clause.   In fact, when the Leases were negotiated, Magnum's representative, Mr. John Przepiora, represented that each of the well drilling and unitization restrictions applied separately to each parcel, so that if a conforming well was not drilled on each parcel owned by the Plaintiffs, that the lease would be cancelled as to the undrilled parcels.   The Witter Plaintiffs, Chambers Plaintiffs, and Day Plaintiffs each had similar conversations with Mr. Przepiora, and each agreed that unless conforming wells were drilled on each of their separate parcels, those parcels would be surrendered under the lease.

**<u>Chesapeake Breached Plaintiffs' Leases, Which Expressly Prohibit
Deductions for Post-Production Costs to Be Charged Against Plaintiffs'
Royalties, and Equinor Paid Royalties on a Transaction Structure That
Deprived Plaintiffs of the Royalties to Which They Are Entitled</u>**

49.    In their original unamended form, the Leases contemplate a "netback" methodology.   That is, the Leases originally contemplated that the gas would be sold to end users in downstream markets and that the lessee would be able to deduct post-production costs incurred in getting the gas to those markets.

50.    However, the Plaintiffs' Leases were all amended at the time of their signing when the original parties crossed off and removed the language that would have allowed deduction of post-production costs to get the gas to the downstream markets.  *See*, *supra*, paragraphs 6 & 7.

51.    Thus, the Leases, in their amended form, contemplate that gas will be sold in downstream markets without deduction for post-production costs.

52.     Plaintiffs' Leases all expressly prohibit the deduction of post-production costs.

53.     The signing parties crossed out language in Paragraph 4(B) of the Leases that might have permitted lessees to deduct post-production costs from royalties due to Plaintiffs.

54.     Plaintiffs and the lessee both initialed next to the crossed-out language in Paragraph 4(B) to acknowledge their agreement to the modification of lease language to prohibit deductions.

55.     The original lessee under all of the Leases was Magnum.

56.     Prior to the execution of each of the Leases, Magnum's representative, John Przepiora, met with Plaintiffs and explained that crossing out the language concerning deductions for post-production costs would guarantee that any lessee would be prohibited from deducting post-production costs from their royalty payments.  Mr. Przepiora thus confirmed to Plaintiffs that, with the leases modified as they were, Plaintiffs would receive royalties based on 100% of the revenue any lessee received from the sale of Plaintiffs' gas and that there would be no deductions for post-production costs incurred in preparing the gas for sale or transporting the gas to the downstream point of sale.

57.     Mr. Przepiora made substantially identical representations to all Plaintiffs (or their predecessors) before their signing the Leases.

58.    Despite the express and unambiguous prohibition on deducting post-production costs from royalties due to the Plaintiffs, Chesapeake has routinely levied such deductions against Plaintiffs' royalty payments.    Thus, although Chesapeake sold the gas in downstream markets, Chesapeake has breached the royalty payment term of the Leases by taking deductions for post-production costs.

59.    As described more fully below, Equinor paid royalties based on a transaction structure involving its affiliate company that evaded its obligation to sell Plaintiffs' gas in downstream markets and to calculate royalties based on such sales.

## Equinor's Improper Affiliate Transactions and Manipulation of Index Hubs to Benefit Itself at Plaintiffs' Expense

60.    The Leases include a royalty payment term that requires payment of royalties based on the price the lessee receives for gas marketed from the premises.  The term requires that the lessee

> pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas *marketed and used off the premises* and produced from each well drilled thereon, the sum of one-eighth (1/8) of the *price paid to Lessee* for thousand cubic feet of such oil, gas, and/or coalbed methane gas *so marketed and used*.

Leases, ¶ 4(B) (emphasis added).

61.    Equinor breached the terms of the leases by failing to pay Plaintiffs the full amount of royalties that Equinor owed them under the Leases.

16

Instead of paying royalties based on the actual "price paid to Lessee" for "gas marketed and used off the premises," as the Leases require, Equinor has paid, and continues to pay, royalties based on artificially low, artificially set book prices for transfers between Equinor and its marketing arm, Equinor Natural Gas LLC ("ENG") (formerly known as Statoil Natural Gas LLC), a wholly-owned subsidiary of their parent company Equinor ASA (formerly known as Statoil ASA).

62.     Since acquiring an interest in the Leases, Equinor has been taking production of gas from Plaintiffs' properties and has been responsible for the proper determination, calculation, distribution, and payment of royalties due and owing to Plaintiffs on all of Equinor's share of oil and gas sold from their properties under the terms of the Leases. *See* Leases, ¶¶ 10, 20.

63.     However, unbeknownst to Plaintiffs, Equinor began breaching Plaintiffs' Leases immediately as it began taking its share of gas production.

64.     Equinor transfers the gas from Plaintiffs' properties to its affiliated Equnior company, ENG.  Equinor enters on its books an artificially low price for that transfer.

65.     Following this practice, Equinor then improperly calculates royalties based on the artificial price it assigns to the transfers of gas to its affiliated company, ENG, instead of based on the actual proceeds received from

downstream sales to third parties as required by the terms of Plaintiffs' Leases. The internal Equinor transfers and the artificial transfer price do not establish sales or the "price paid to Lessee" for the sale of Plaintiffs' gas "marketed and used off the Premises" because Equinor, through its affiliate, actually markets and sells the gas to end users at significantly higher prices, and Equinor ASA receives the sales proceeds based on such lucrative downstream sales.

66.     Plaintiffs have received, and are entitled to receive, monthly royalties from Equinor for their gas as provided under the terms of the Lease. However, because of Equinor's participation in its parent company's scheme to benefit itself at the expense of its lessors, Plaintiffs have not received all of the royalties due and owing to them under the terms of the Leases because their royalties were not calculated based on the price actually received by Equinor for their gas.

67.     Accordingly, by basing royalty payments on an artificial price that Equinor applies to transfers of gas to an affiliated company at the wellhead instead of on the ultimate sales price received for the gas downstream, including in what Equinor ASA describes as the "highest paying market in the US,"[3] Equinor is breaching its duties to pay Plaintiffs royalties based on the "price paid to Lessee" for gas "marked and used off the Premises."

---

[3] *See* 2008 StatoilHydro ASA Annual Report on 20-F at 19.

68.    Equinor has committed these breaches in furtherance of a scheme that Equinor ASA engineered to obtain gas from Plaintiffs and other landowners at unfair, artificially low prices while using its access to premium markets to benefit its own bottom line at the expense of the Marcellus region landowners, like Plaintiffs, who bargained for and expected a share of those downstream sales.

69.    Although Chesapeake improperly assesses deductions for post-production services, Chesapeake calculates Plaintiffs' royalties under the identical royalty payment terms in the Leases based on a weighted average sales price ("WASP") that represents Chesapeake's revenue from actual sales of gas downstream of the wellhead.  Significantly, Chesapeake is Equinor's assignor, and Equinor has the same obligations that Chesapeake does under the Leases.[4]

**Equinor Enters the Marcellus Region and Contrives to Benefit Itself at Plaintiff's Expense**

70.    Equinor gained access to gas in the Marcellus region so that Equinor ASA could profit by selling in lucrative, high priced markets.   In November 2008, Equinor entered into a transaction with Chesapeake Energy, through which it acquired a 32.5% interest in all of Chesapeake's leases in the Marcellus region, constituting approximately a net 0.6 million mineral/oil and gas

---

[4] The Leases provide that "Lessee shall have the right to assign and transfer the within lease in whole or in part . . . ."  Leases, ¶ 11.

acres of the more than 1.8 million acres Chesapeake had under lease.  Equinor ASA reported in a Form 6-K filed on November 11, 2008, with the Securities and Exchange Commission that it paid $1.25 billion in cash as well as $2.125 billion in the form of "75% carry on drilling and completing of wells during the period 2009-2012" to acquire the 32.5% interest in the Chesapeake leases.  The agreement covered "more than 32,000 leases in the states of Pennsylvania, West Virginia, New York and Ohio."

71.    The agreement included future leases as well.  Equinor ASA explained in the form 6-K that "Chesapeake plans to continue acquiring leases in the Marcellus shale play.  StatoilHydro has the right to a 32.5% participation in any such additional leasehold."

72.    Equinor's statements to its investors, including in its financial reports, characterize the interest acquired from Chesapeake as belonging to Equinor ASA and as serving Equinor ASA's unitary business and corporate interests.  To serve those interests, Equinor holds title to the leases.

73.    Equinor has admitted in public statements, such as investor presentations, that it and ENG are "part of the Statoil ASA affiliated entities."

74.    Creating a vertically integrated operation in order to maximize profits for Equinor ASA was a company goal from the time of Equinor's entry into the Marcellus region.

75.    In investor materials available on Equinor ASA's website, Equinor ASA reports about its interests in the northern Marcellus region and includes the interests held by Equinor and the pipeline access to major markets held by ENG.  For example, Equnior ASA's "Update on US Onshore August 2014" describes Equinor ASA's strategy of obtaining production from Marcellus wells in which it has an interest and then selling that gas into "premium markets in Toronto and New York."

76.    Equinor ASA reports on its activities in the Marcellus region in its Annual Report on Form 20-F, which is filed with the Securities and Exchange Commission.   For example, Equinor ASA's Annual Report for 2013 states "Statoil's entry into the Marcellus and the Eagle Ford shale gas plays has resulted in a significant increase in the volume of gas marketed and traded by Statoil in the USA over the last years."   Equinor ASA notes the involvement of ENG in marketing natural gas from the Marcellus region and in securing pipeline capacity "enabling Statoil to transport gas from the Northern Marcellus production area to Manhattan, NY."  Statoil ASA 2013 Annual Report on Form 20-F at 40.

77.    Equinor ASA often touts to investors its ability to sell Marcellus gas into the highest price markets in the Northeast.  For example, in the 2008 StatoilHydro ASA Annual Report on 20-F, Equinor ASA called its agreement with Chesapeake a "major building block in [Equinor's] US gas value

chain," saying, "[t]he company gets access to reserves produced close to the highest paying market in the US and is building on our . . . well-established gas marketing and trading organisation." *Id.* at 19 (emphasis added).

78.    Even today, Equinor ASA's website states: "We have also entered agreements for the transport and delivery of natural gas to New Jersey and New York City, and since 2003 we have built a marketing organisation for natural gas in the USA." *See* How Shale Transformed the Energy Market, available at https://www.statoil.com/en/magazine/how-shale-transformed-the-energy-market.html.

79.    Accordingly, Equinor ASA has the capacity to sell, and does sell, Marcellus gas into premium markets.  For example, in 2009, ENG, Equinor ASA's marketing arm, entered transportation agreements with Tennessee Gas Pipeline and Texas Eastern Transmission that ensured Equinor the right to transport up to 2 billion cubic meters ("bcm") per year from the northern Marcellus region to New York City and surrounding areas, the very market Equinor ASA touted in investor materials as the highest priced market in the United States.  In addition, in 2010, ENG entered a transportation agreement with National Fuel Supply Corporation for up to 3.2 bcm per year.  This agreement enabled Equinor to transport gas from the Northern Marcellus region to the United States/Canada border at Niagara Falls, providing Equinor ASA access to lucrative urban markets

in Eastern Canada.  Equinor ASA reported that these agreements had secured access to some of the main pipeline systems for delivery of gas in the New York City area and were expect to help maximize the value of Equinor's gas produced from its new interests in the Marcellus.  Equinor announced that it expected these agreements would allow it to sell its gas into the most attractive gas market in the United States.  *See* StatoilHydro ASA 2009 Annual Report on Form 20-F at 63.

80.     Thus, as reflected in Equinor ASA's 2008 20-F and other public statements, Equinor ASA touts itself as a company that controls, through subsidiaries, a lucrative vertically-integrated natural gas supply chain from source to market.  Equinor ASA's statements are based on its position that it is the company that ultimately owns, controls, and financially benefits from an integrated operation in the Marcellus region.

**Equinor ASA's Scheme to Enhance Its Profits at the Expense of Lessors**

81.     Equinor ASA developed and structured its operations in the Marcellus region, including Equinor and ENG, to exploit Equinor ASA's vertically integrated business and its ability to obtain Marcellus gas and sell it into premium markets for its own benefit while improperly minimizing royalty payments to Plaintiffs and other lessors.

82.     The scheme consists of having Equinor calculate royalties based on an artificial transfer of gas from Equinor to ENG, not based on

23

downstream sales and prices actually received. In so doing, Equinor minimizes and depresses royalties to landowners, which has the effect of minimizing the cost of gas that it obtains from the Marcellus region.

83.   Equinor did not disclose the basis on which it was calculating royalties to Plaintiffs.

84.   ENG uses the pipeline capacity it has obtained to market gas, including gas produced from Plaintiffs' properties, to end users at higher prices than Equinor uses to calculate royalties to Plaintiffs. Through this arrangement, along with other associated practices, Equinor ASA (in concert with Equinor and ENG) deprives Plaintiffs of the benefit it keeps for itself of higher priced sales downstream of the contrived transfer of gas between Equinor and ENG.

85.   Thus, Equinor ASA is able to use Equinor and ENG as a vertically integrated source-to-market business operation in which it depresses the cost of gas to itself while maximizing the benefits it obtains from the sale of that gas or sale of pipeline capacity. As explained above, this contrivance improperly cuts landowners like Plaintiffs out of the royalties they bargained for.

86.   Adding insult to injury, Equinor has improperly and unilaterally manipulated the depressed "reference price" that it uses in calculating royalty payments for Plaintiff to further depress the price of gas in order to improperly benefit Equinor ASA at Plaintiffs' expense

87.    For example, prior to August 2013, Equinor set the price of gas transferred to ENG at the wellhead according to the prevailing index price at a pipeline hub near Pittsburgh.   However, in or about August 2013, Equinor unilaterally and without notice to Plaintiffs, began using a lower prevailing index price at pipeline hubs in Northeast Pennsylvania to set the price of gas transferred to ENG.  Equinor made this change of its index hub to Equinor ASA's benefit and Plaintiffs' detriment.

88.    Highlighting Equinor ASA's intent to reap every benefit for itself while minimizing benefits to Plaintiffs, the shift in the "reference price" to a hub more favorable to Equinor ASA's bottom line in 2013 occurred as Equinor ASA, through its subsidiaries, gained increased access to lucrative markets like New York City through additional reserved pipeline capacity it publicly boasted about to investors, allowing Equinor ASA to extract even greater profits for its own benefit while further depressing the price on which it calculated the royalties it paid to Plaintiffs.

89.    Equinor's affiliate ENG regularly obtains much higher prices for Plaintiffs' gas than the "reference price" when it sells the gas (or sells pipeline capacity to profit from price differentials) into downstream markets like New York City.

90.    For example, in January 2018, Equinor paid Richard Witter royalties of $2.20 per mcf of production based on affiliate transfers and index pricing.  However, for the same month, Equinor paid a landowner in a production unit bordering the Wootten North Unit royalties of $7.15 per mcf of production, apparently based on Equinor's promise to that landowner to use actual downstream sales of gas to determine his royalties.

91.    As an instrument in Equinor ASA's scheme, Equinor breached its express duty under the Leases to pay Plaintiffs royalties based on the "price paid to Lessee," by paying royalties based on a price artificially assigned to transfers to an affiliated Equinor company in order to benefit Equinor ASA.

92.    Likewise, Equinor breached the Leases' terms reflecting the contracting parties' intent that royalties be calculated based on downstream sales at arm's length to unaffiliated parties without deductions for post-production costs, not transfers at the wellhead to affiliated companies.

93.    Finally, Equinor's performance under the Leases violated its duty of good faith and fair dealing, which inheres in every contract and cannot be disclaimed, by engaging in an affiliate transfer scheme in which Equinor paid royalties based on a transaction structure that enriched Equinor and its parent company at Plaintiffs' expense.

**Plaintiffs Have Complied With All Conditions Precedent to Bringing Suit**

94.     The Leases state, in part:

> In the event Lessor considers that Lessee has not
> complied with any of its obligations hereunder, either
> express or implied, Lessor shall notify Lessee in writing
> setting out specifically in what respects Lessee has
> breached this contract. Lessee shall then have thirty (30)
> days after receipt of said notice within which to meet or
> commence to meet all or any part of the breaches alleged
> by Lessor. The service of such notice shall be precedent
> to the bringing of any action by Lessor on said lease for
> any cause, and no such action shall be brought until the
> lapse of thirty (30) days after service of such notice on
> Lessee. . . .

Leases, ¶ 16.

95.     The Witter Plaintiffs notified Chesapeake of its breaches of the

Leases by memorandum dated September 16, 2015.  A copy of the September 16,

2015 memorandum is attached as Exhibit C.  The memorandum addresses two

ways in which Chesapeake breaches the Leases: (1) Chesapeake's improper

deduction of post-production costs under the Leases; and (2) Chesapeake's

violation of the well-density clause's requirement of a minimum ratio of one well

per 160 acres in a production unit.  *See* Ex. C.

96.     Chesapeake acknowledged receipt of this memorandum and

notice of its breaches in a letter from its outside counsel to the Witters' counsel

dated October 16, 2015.  *See* October 16, 2015 letter from G. Miller to A. Hovan,

attached hereto as Exhibit D.

27

97.    Chesapeake refused to correct its breaches of the Leases described in the memorandum. *See* Ex. D.

98.    The remaining Plaintiffs notified Chesapeake and Equinor, and the Witter Plaintiffs notified Equinor, of their breaches of the Leases in writing by letters dated July 13, 2018, which were transmitted to Defendants' representatives by email that day.   Copies of the July 13, 2018 letters are attached hereto as Exhibit E.

99.    More than 30 days have passed since service of the July 13, 2018 notice letters, and Chesapeake and Equinor have continued to refuse to correct their breaches of the Leases described in the letters.

100.    Accordingly, all Plaintiffs have satisfied the notice clause in the Leases.

## CAUSES OF ACTION

### COUNT I

### Breach of Contract

### 160 Acre Well Density Clause Violation
### Against Chesapeake and Equinor
### (On Behalf of the 160 Acre Well Density Plaintiffs)

101.    Plaintiffs incorporate the allegations of paragraphs 1-100 above as if fully set forth herein.

102.   Plaintiffs own interests in the Leases described above, which are contracts pursuant to which Chesapeake and Equinor had development and unitization obligations.

103.   In breach of the lease terms, Defendants developed the 160 Acre Well Density Plaintiffs' leaseholds in violation of the Lease's well-density clause.

104.   Defendants violated the well-density clause because they created the Wootten North Unit as a 300-acre unit with one well.

105.   The Leases' well-density clause requires a minimum ratio of at least one well per 160 acres.  Thus, under the Leases, for there to be at least one well per 160 acres, a second well is required when a production unit exceeds 160 acres.

106.   Because the Wootten North Unit has only one well for its 300 acres, it violates the Leases' unitization clause.

107.   This violation of the well-density requirement of the unitization clause means that Defendants exceeded their unitization authority, which, under Pennsylvania law, derives exclusively from the Leases in the case of Marcellus Shale wells.

108.   Defendants consequently created invalid production units in breach of the Leases' requirements.

109.   Accordingly, Plaintiffs are entitled to their actual damages, statutory or other interest at the maximum allowable rate, costs of suit, and any further relief the Court deems appropriate.

## COUNT II

### Breach of Contract

### Specific Performance or Termination
### Against Chesapeake and Equinor
### (On Behalf of the 160 Acre Well Density Plaintiffs)

110.   Plaintiffs incorporate the allegations of paragraphs 1-109 above as if fully set forth herein.

111.   Defendants' breaches of the requirements of the unitization clause constitute a material breach of the Leases that warrant specific performance or termination of the Leases.

112.   Defendants' failure to maintain a density of at least one well per 160 acres in a unit frustrates the express bargain that Plaintiffs obtained concerning the full development of their leaseholds.  Defendants have fundamentally frustrated Plaintiffs' expectations and the purpose of the Leases to ensure full development.

113.   Defendants' material breaches irreparably harm Plaintiffs, who have been deprived of their ability to develop their unique assets and business opportunities by contracting with other oil and gas companies to develop their unique land properly.   Money damages are inadequate to remedy the harm Defendants are inflicting on Plaintiffs.

30

114.   Defendants' failure to drill sufficient wells in the Wootten North Unit means that the Plaintiffs' reasonable expectations will be continuously thwarted on an ongoing basis.

115.   Defendants have never offered to rectify their breach of the unitization clause.

116.   The failure to develop the Plaintiffs' leasehold properties as contemplated by the Leases does not comport with standards of good faith and fair dealing.   Defendants have locked up Plaintiffs' properties with the Leases and, through Defendants' breach of the well-density requirements of the unitization clause, have failed to develop the properties properly.

117.   Thus, it would be appropriate to compel Defendants to perform their obligations under the well-density provision and complete sufficient numbers of additional wells to satisfy the minimum well density of one well per 160 acres, or alternatively to deunitize the units that violate the well-density provision— allowing Defendants to create units that comply with the Leases' requirements— while terminating the Leases as to the undeveloped portions of the leasehold to bring the Defendants into compliance.

118.   Accordingly, Plaintiffs are entitled to a decree of specific performance requiring Defendants to comply with the well-density requirements of the unitization clause.

119.   In the alternative, the material nature of Defendants' breach of the Leases entitles Plaintiffs to elect to terminate the leases in their entirety.

## COUNT III

### Breach of Contract

**Habendum Clause Violation**
**Against Chesapeake and Equinor**
**(On Behalf of the 160 Acre Well Density Plaintiffs)**

120.   Plaintiffs incorporate the allegations of paragraphs 1-119 above as if fully set forth herein.

121.   The specific language of the unitization clause defines what constitutes production "on the premises" as that term is used in the Leases (including the habendum clause).

122.   Because Defendants failed to comply with the unitization clause's well-density requirement, Defendants have not satisfied the habendum clause's requirement for production in paying quantities "on the premises" under the terms of the Leases.

123.   Thus, Defendants' violation of the unitization clause's well-density requirement means Defendants also violated the plain language of the habendum clauses.

124.   Plaintiffs' Leases are beyond the initial five-year term of the habendum clause.

125.   As a result of Defendants' breach of the requirement to produce "on the premises," Plaintiffs are entitled to terminate the Leases for Defendants' violation of the habendum clause.

## COUNT IV

### Breach of Contract

### Post-Production Cost Deduction Violation
### Against Chesapeake
### (All Plaintiffs)

126.   Plaintiffs incorporate the allegations of paragraphs 1-125 above as if fully set forth herein.

127.   In breach of the Leases' terms, and in particular the crossed out language in the royalty payment term, Chesapeake improperly took deductions against Plaintiffs' royalties for purported post-production services.

128.   Chesapeake caused Plaintiffs damages by breaching the Leases' royalty payment terms.

129.   Accordingly, Plaintiffs are entitled to their actual damages, statutory or other interest at the maximum allowable rate, costs of suit, and any further relief the Court deems appropriate.

## COUNT V

### Breach of Contract

### Affiliate Transfer Violation
### Against Equinor
### (All Plaintiffs)

130.   Plaintiffs incorporate the allegations of paragraphs 1-129 above as if fully set forth herein.

131.   Plaintiffs entered into the Leases, which are contracts pursuant to which Equinor owed and owes royalties for the production and sale of Plaintiffs' gas.

132.   Per the terms of the Leases, Plaintiffs' royalties must be calculated based on the actual price Equinor receives for sale of the gas marketed and sold off the premises, including sales to end users in the premium markets that Equinor ASA touts as the most lucrative part of its gas marketing chain in North America.

133.   Plaintiffs have been damaged as a result of Equinor's use of artificial prices assigned to affiliate transfers in breach of the Leases' royalty payment terms and are entitled to judgment against Equinor in the amount of their actual damages, statutory or other interest at the maximum allowable rate, costs of suit, and any further relief the Court deems proper.

134.   Equinor's conduct artificially depressing the royalty payments to Plaintiff while using an affiliate marketing company to realize and appropriate profits from downstream sales into premium markets for the Equinor ASA group of companies constitutes a violation and breach of the Leases' royalty payment terms.

135.   Accordingly, Plaintiffs are entitled to their actual damages, statutory or other interest at the maximum allowable rate, costs of suit, and any further relief the Court deems appropriate.

## COUNT VI

### Breach of Contract

### Breach of Duty of Good Faith and Fair Dealing
### Against Equinor
### (All Plaintiffs)

136.   Plaintiffs incorporate the allegations of paragraphs 1-135 above as if fully set forth herein.

137.   Equinor owed Plaintiffs an implied duty of good faith and fair dealing at all times under the Leases.  The duty of good faith and fair dealing is fundamental to all contracts in Pennsylvania and cannot be disclaimed.

138.   Equinor has abused its discretion and breached the duty of good faith and fair dealing by using affiliate transfers as part of a scheme to benefit itself and its parent company at Plaintiffs' expense.

139.   In particular, Equinor's manipulation in 2013 of the index hub to depress the price it assigned to Plaintiffs' gas and to increase profits for its parent company constitutes performance under the Leases in violation of the duty of good faith and fair dealing.

140.   At all times, the duty of good faith and fair dealing required Equinor to market the gas produced from Plaintiffs' properties in a manner that would benefit both Plaintiffs and Equinor.

141.   Equinor's conduct (*i.e.*, calculating royalties based on an artificial transfer price while, in fact, selling Plaintiffs' gas downstream for significant profits that it and its affiliated companies appropriate to themselves at the expense of Plaintiffs) in paying royalties based on a transaction structure that avoided its obligations to calculate royalties based on actual downstream sales of Plaintiffs' gas breached Equinor's duty of good faith and fair dealing.

142.   Equinor ASA's extensive statements about its success using its subsidiaries' sophisticated production and marketing organization to sell Marcellus gas into premium markets such as New York and Toronto demonstrate that Equinor is not operating the leased premises for the benefit of Plaintiffs.   By calculating royalty payments on an artificial, depressed market value at the wellhead, Equinor is not acting in good faith, producing and selling gas from

Plaintiffs' properties in a manner that benefits Equinor and its affiliated companies while depriving Plaintiffs of the benefits to which they are entitled.

143.   Likewise, to the extent that Equinor and its affiliated companies used their pipeline capacity to deliver third-party gas instead of Plaintiffs' gas to premium markets, they operated in a manner that benefitted Equinor ASA at the expense of Plaintiffs.

144.   Under the duty of good faith and fair dealing, Plaintiffs' royalties must be calculated based on the actual prices received for sale of the marketed gas, including sales to end users in the premium markets that Equinor ASA touts as the most lucrative part of its gas marketing chain in North America.

145.   Equinor's transfers of gas to ENG are an integral part of a scheme that benefits their corporate parent at Plaintiffs' expense by depressing the prices on which Plaintiffs' royalties are calculated while appropriating profits from lucrative downstream sales to Equinor's parent company.

146.   Accordingly, Plaintiffs are entitled to their actual damages, statutory or other interest at the maximum allowable rate, costs of suit, and any further relief the Court deems appropriate.

WHEREFORE, Plaintiffs pray that the Court will enter judgment in their favor and against Defendants as follows:

a.     Awarding Plaintiffs their actual damages, statutory or other interest at the maximum allowable rate, and costs of suit for Defendants' breaches of the Leases;

b.     Granting a decree of specific performance requiring Defendants to comply with the requirements of the Leases' unitization clause to maintain a minimum well density of at least one well for every 160 acres in a production unit or, at Plaintiffs' election, a judgment terminating the Leases; and

c.     Awarding such other relief as the Court deems proper.


Dated:  August 31, 2018                    _____s/Ira Neil Richards_____
                                           Ira Neil Richards (PA 50879)
                                           Arleigh P. Helfer III (PA 84427)
                                           SCHNADER HARRISON SEGAL & LEWIS LLP
                                           1600 Market Street, Suite 3600
                                           Philadelphia, PA 19103
                                           Voice: (215) 751-2000
                                           Fax: (215) 751-2205
                                           irichards@schnader.com
                                           ahelfer@schnader.com

                                           Aaron D. Hovan (PA 308412)
                                           John J. Hovan (PA 8486)
                                           Law Offices of John J. Hovan
                                           154 Warren Street
                                           Tunkhannock, PA 18657
                                           (570) 836-3121

## <u>CERTIFICATE OF SERVICE</u>

I, Ira Neil Richards, certify that this 31st day of August, 2018, I caused the foregoing Second Amended Complaint to be filed and served on all counsel of record via the Court's ECF system, where it is available for viewing and downloading.

s/Ira Neil Richards         
