# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM A. CHAMBERS, *et al.*, | |
| Plaintiffs, | NO. 3:18-CV-00437 |
| v. | (JUDGE CAPUTO) |
| CHESAPEAKE APPALACHIA, L.L.C. and EQUINOR USA ONSHORE PROPERTIES, INC., | |
| Defendants. | |

## **MEMORANDUM**

When an oil and gas company suspects valuable fossil fuels rest below swaths of land, it leases mineral rights from the people who own that land on the surface. These leases typically allow the company to build wells to capture oil and gas, in exchange for a portion of the profit (a "royalty") payable to the landowners. The Plaintiffs in this case—the landowners—allege that the Defendant oil and gas companies skirted the terms in their leases governing royalties and well-building. (*See* Doc. 30). The Defendant companies, Chesapeake Appalachia and Equinor USA Onshore Properties, responded with Motions to Dismiss (Docs. 34 and 35 respectively), which are presently before me. Defendants contend that they have complied with the unambiguous terms of the leases. But because crucial portions of the leases are unclear, and because Plaintiffs have adequately pled their claims, Defendants' Motions to Dismiss will be denied.

## **I. Background**

Plaintiffs are all landowners in Tunkhannock and neighboring Mehoopany, Pennsylvania. (Doc. 30 at ¶¶ 12-21). In October of 2007, Plaintiffs entered into oil and gas leases with Magnum Land Services, a "landman" that leases mineral rights from landowners on behalf of oil and gas companies. (*See id.* ¶ 22). Magnum accordingly assigned its interests in the leases to Defendants, Chesapeake and Equinor, making them the lessees. (*See id.* ¶¶ 22-27).

There are two clauses of the leases which form the basis of Plaintiffs' complaint: the "unitization" clauses and the royalty clauses. As a brief aside, a unitization clause permits a lessee to group a lessor's land with neighboring lessors' lands into a single oil and gas production unit. *See, e.g.*, Stewart v. SWEPI, LP, 918 F. Supp. 2d 333, 337-38 (M.D. Pa. 2013). The purpose of unitization is to more efficiently capture underground oil and gas resources, which, by their nature, are not neatly divided between landowners on the surface. *See Ohio Oil Co. v. Indiana*, 177 U.S. 190, 209-10 (1900). Even in the absence of an agreement between a landowner and a prospector, states can mandate unitization for "securing a just distribution" of resources and "preventing waste." *Id*. at 210.

Back to this case. The unitization clauses at issue provide:

> Lessor hereby grants to the Lessee the right at any time to consolidate the leased premises or any part thereof or strata therein with other lands to form a oil, gas, and/or coalbed methane gas development unit of not more than 640 acres, or such larger unit as may be required by state law or regulation for the purpose of drilling a well thereon and Lessee shall be required to maintain a well density of at least 1 well per 160 acres contained in such unit. (Doc. 30-1, Exhibits A-1 through A-3, § 8 (hereinafter "Leases")).

Some of Plaintiffs' lands have been consolidated into the "Wootten North Unit," a production unit of about 300 acres. (Doc. 30 at ¶¶ 3, 38). But the Wootten North Unit only has one well. (*Id.* ¶ 38). Plaintiffs allege this violates the unitization clauses because, under their understanding, the well density of any unit must be "at least 1 well per 160 acres." (*Id.* ¶¶ 36, 39). Furthermore, because the current well-to-acre ratio violates the unitization clauses, Plaintiffs allege that Defendants have correspondingly breached the clauses governing the leases' length (the "habendum" clauses). (*Id.* ¶¶ 42-48).

The dispute over the royalty clauses is more complex. The royalty clauses require that the lessee

> pay to the Lessor as royalty for the oil, gas, and/or coalbed methane gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marketed and used. Payment

2

> of royalty for oil, gas, and/or coalbed methane gas marketed
> during any calendar month to be on or about the 60th day after
> receipt of such funds by the Lessee. (Leases § 4(B)).

All the leases included additional language which was crossed out by the original contracting parties. (Doc. 30 at ¶¶ 53-54). The crossed-out language provided that the one-eighth (1/8) royalty would be "less or net any post-production costs paid by the Lessee to prepare for and/or deliver the oil, gas, and/or coalbed methane gas for sale[.]" (Leases § 4(B)). Before the leases were executed, John Przepiora, Magnum's representative, explained to Plaintiffs "that crossing out the language . . . would guarantee that any lessee would be prohibited from deducting post-production costs from their royalty payments." (Doc. 30 at ¶¶ 56-57). Despite this, Chesapeake "has routinely levied such deductions against Plaintiffs' royalty payments." (*Id.* ¶ 58).

Equinor was craftier in reducing its royalty burden, according to Plaintiffs. "Instead of paying royalties based on the actual 'price paid to Lessee' for 'gas marketed and used off the premises,' as the Leases require, Equinor has paid, and continues to pay, royalties based on artificially low, artificially set book prices for transfers between Equinor and its marketing arm, [ENG]." (*Id.* ¶ 61 (quoting the leases)). Equinor avoids paying Plaintiffs the royalties they are allegedly entitled to via a three-step process: (1) Equinor sells the gas captured from Plaintiffs' properties to its fellow subsidiary, ENG, at an artificially low price, one-eighth (1/8) of which Plaintiffs receive as royalties; (2) ENG in turn "markets and sells the gas to end users at significantly higher prices;" and then (3) Equinor ASA (Equinor and ENG's parent company) pockets the difference. (*Id.* ¶¶ 64-68). Plaintiffs allege they are instead entitled to one-eighth (1/8) of "the ultimate sales price received for the gas downstream," not the "artificial price that Equinor applies to transfers of gas to [ENG] at the wellhead [*i.e.*, when the gas leaves the ground but before it is processed for sale.]" (*Id.* ¶ 67). Additionally, Plaintiffs allege Equinor has "improperly and unilaterally manipulated the depressed 'reference price'" it charges ENG to further lower Plaintiffs' royalties. (*Id.* ¶¶ 86-88, 139). These practices, Plaintiffs claim, violate both the express terms of the leases and

3

the implied covenant of good faith and fair dealing. (*Id.* ¶¶ 130-46).

Besides damages, Plaintiffs seek specific performance of the unitization clauses, or in the alternative, a judgment terminating the leases. (*Id.* ¶ 146). Chesapeake moves to dismiss only Counts I through III of the complaint, which allege violations of the leases' unitization and habendum clauses, leaving the dispute over their royalty calculations for another day. (*See* Docs. 34, 39). Equinor, on the other hand, moves to dismiss all claims brought against it. (*See* Docs. 35, 38). The Motions to Dismiss have been fully briefed and are now ripe for review.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. The defendant, as the movant, bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). When considering a Rule 12(b)(6) motion, my role is limited to determining if a plaintiff is entitled to offer evidence in support of his claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement required by Rule 8(a)(2) must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). Detailed factual allegations are not required. *Id.* However, "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts to support its claims for relief. *Id.*; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory

allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. But I cannot assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), consider "matters extraneous to the pleadings," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (Alito, J.), or credit a complaint's "bald assertions" or "legal conclusions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quotation omitted).

### III. Discussion

**A.     Contract Interpretation**

The crux of the dispute at this early stage is the parties' competing interpretations of the leases' provisions. Defendants argue that the plain meaning of the clauses at issue defeat Plaintiffs' claims, (*see, e.g.*, Doc. 38 at 11, 23; Doc. 39 at 5), whereas Plaintiffs argue the language is clearly in their favor or at least ambiguous (*see, e.g.*, Doc. 42 at 18, 27).

Oil and gas leases are interpreted just like any other contract. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012) (citation omitted).The ultimate goal in interpreting a contract is ascertaining—and enforcing—the parties' manifested, objective intent. *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009). I interpret the unambiguous portions of a contract as a matter of law, and the fact-finder interprets the

5

ambiguous portions. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980) (citing *Brokers Title Co. v. St. Paul Fire and Marine Ins. Co.*, 610 F.2d 1174, 1178 (3d Cir. 1979)). However, I must first determine as a matter of law whether contractual language is ambiguous. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

"A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). A mere difference in interpretation, however, does not render a contract ambiguous. *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984). In determining whether a contract is ambiguous, I must consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Baldwin*, 636 F.3d at 76 (quotation omitted). The plain meaning of the words used in the contract controls, not the "silent intentions" of the contracting parties. *J.K. Willison v. Consol. Coal Co.*, 637 A.2d 979, 982 (Pa. 1994). And I "must assess the writing as a whole and not in discrete units." *DiFabio v. Centaur Ins. Co.*, 531 A.2d 1141, 1143 (Pa. Super. Ct. 1987).

There are a few more rules. An ambiguity is patent if it "appears on the face of the instrument, and arises from the defective, obscure or insensible language used." *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982). A latent ambiguity, on the other hand, "arises from extraneous or collateral facts which make the meaning of a written agreement uncertain" even though the language used is clear at first glance. *Id.* The distinction between the two matters because a party cannot use extraneous material to create a latent ambiguity if there is no contractual hook for the party's interpretation or if the interpretation contradicts the "standard meaning" of the language at issue. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 96 (3d Cir. 2001).

**B.    Unitization**

    1.    <u>Applicability of the well density requirement</u>

I will start with the unitization clauses. The clauses provide the lessee may form a

"development unit of not more than 640 acres, or such larger unit as may be required by state law or regulation for the purpose of drilling a well thereon and Lessee shall be required to maintain a well density of at least 1 well per 160 acres contained in such unit." (Leases § 8). The clauses thereafter refer to "said development unit" and "said unit." (*Id.*). Defendants insist that the requirement "to maintain a well density of at least 1 well per 160 acres contained in *such* unit" unambiguously applies only to "*such* larger unit as may be required by state law or regulation," not a unit it creates of "not more than 640 acres." (Doc. 39 at 9-12 (emphasis added)). The parallel use of the word "such," Defendants argue, unambiguously shows that the well density requirement only applies to units larger than 640 acres. (*Id.* at 8). So does the placement of a comma and the word "or," which separate the "not more than 640 acres" provision from the rest of the clause. (*Id.* at 10). Plaintiffs respond that the well density requirement unambiguously applies to all units, not just those larger than 640 acres. (Doc. 42 at 17). They point to the fact that 640 acres is neatly divisible by 160 acres, "demonstrating an intent on the part of the original contracting parties" to make the well density requirement applicable to all units; Plaintiffs also argue the unitization clauses use the word "unit" to refer both to a "unit of not more than 640 acres" and to "such larger unit as may be required by state law or regulation." (*Id.* at 17-18).

What is clear is that the well density provisions are patently ambiguous as to whether they apply to all development units. Starting with Plaintiffs' proffered interpretation, the fact that 160 divides into 640 neatly is a sign that the well density requirement may apply to units of not more than 640 acres. And "such unit" may refer to both smaller and larger units: the omission of the modifier "larger" could indicate "such unit" is used in a broad sense rather than a narrow one, encompassing all development units. *See Northway Village No. 3, Inc. v. Northway*, 244 A.2d 47, 50 (Pa. 1968) (applying *noscitur a sociis*, the maxim that "the meaning of words may be indicated . . . by those words with which they are associated," to interpret a clause in a lease). If the well density requirement applied only to larger units, the drafter might have used the phrase "such larger unit" in parallel. Indeed, the clauses following the well density provisions use the phrases "said development unit" and "said unit"

7

to refer to both kinds of units. That, in combination with the rest of the language used, tends to show the contracts create a genus (units or development units) and species thereof (larger units required by state law or regulation, and smaller units of not more than 640 acres). In this context, the general term "unit" would include both species of units. *See, e.g., Smith v. Conn. Gen. Life Ins. Co.*, 18 Pa. D. & C. 230, 231 (Allegheny Cty. Ct. 1932). Finally, only Plaintiffs' interpretation avoids the result that a 640-acre unit could have only one well, but a 641-acre unit would need to have at least four—this may be an absurd result, considering the purpose of unitization is efficiency and waste-reduction. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 96 (3d Cir. 2001) (courts may discard absurd and unreasonable interpretations in favor of sensible and reasonable ones).

But Defendants also muster compelling textual evidence in support of their interpretation. The parallel use of "such" may indicate the qualifying phrase "as may be required by state law or regulation" modifies both "such larger unit" and the later phrase "such unit," even though the qualifying phrase is sandwiched between the two. Courts have held that parallel or related phrasing can surmount the rule of the last antecedent—a rule that provides "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). *See Lockhart v. United States*, 136 S. Ct. 958, 962-63 (2016) (the rule can be "overcome by other indicia of meaning" (quotation omitted)); *Chester Water Auth. v. Pa. Pub. Util. Comm'n*, 868 A.2d 384, 391 (Pa. 2005) (holding that, in the context of statutory interpretation, parallel use of "such" in a list of items means the qualifying clause following the list applies to each item and not just the last item). Additionally, the unitization clauses use the phrases "said development unit" and "said unit" to refer to all units; the slightly different phrases "such larger unit" and "such unit" may thus refer to only one kind of unit. Defendants finally rely on the comma and "or" that separate the two types of units. Punctuation, on its own, is not of interpretive aid. *See Richter v. Com. Cas. Co.*, 93 Pa. Super. 28, 34 (1928) ("In interpreting any contract the words and not the punctuation are the controlling guide[.]"). But the fact that a comma and "or" split the unitization clauses in

half supports Defendants' interpretation, given the more deliberate use of commas elsewhere in the unitization clauses and the lack of a comma offsetting the well density requirement. *But see BL Partners Grp., L.P. v. Interbroad, LLC*, No. 465 EDA 2016, 2017 WL 2591473, at *4-5 (Pa. Super. Ct. June 15, 2017) ("[W]e cannot agree with the trial court that the intent of the contracting parties was made clear by the use of the comma and the word 'or' preceding the [clause at issue.]").

All of that is to say, at this early stage, it is unclear if the well density requirement applies to the 300-acre Wootten North Unit at issue. Plaintiffs and Defendants have proffered reasonable but conflicting interpretations of the unitization clauses. Thus, Plaintiffs' claims for breach of the unitization and habendum clauses survive, but only if it is clear or at least ambiguous that the well density requirement would require the Wootten North Unit to have at least two wells.

### 2. The well density requirement

The next dispute is accordingly over the meaning of the well density requirement. Again, the parties are at odds. Plaintiffs insist that "at least 1 well per 160 acres" means a 300-acre unit cannot have just one well, because that creates a ratio of one well to 300 acres. (Doc. 42 at 15-16). Defendants respond that "*per* 160 acres" means "*for each* 160-acre *group*," which in turn means a 300-acre unit has one 160-acre group to which the density requirement applies and one 140-acre group to which it does not. (*See* Doc. 39 at 12-14).

I agree with Plaintiffs. The text of the unitization clauses is clear: there must be a well density of "at least 1 well per 160 acres." Because it is impossible to maintain a fraction of a well, a unit of more than 160 acres but less than or exactly 320 acres must therefore have at least two wells. Defendants' proffered interpretation contradicts the plain language used. There is no mention of the 160-acre "groups" within units that Defendants read into the clauses. Nor do the clauses suggest Defendants cannot breach the density requirement by only maintaining one well unless the unit contains at least 320 acres (*i.e.*, two 160-acre groups). (*See* Doc. 39 at 13 n.5). That would result in a ratio of one well per 160 acres *at*

9

*most*, not *at least*, which is not what the original contracting parties agreed to. *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986) ("The law will not imply a different contract than that which the parties have expressly adopted."). Moreover, Defendants' interpretation would yield strange results elsewhere in the contracts. *See DiFabio v. Centaur Ins. Co.*, 531 A.2d 1141, 1143 (Pa. Super. Ct. 1987) (contracts may not be interpreted in discrete units). For example, by Defendants' logic, the royalty clauses' requirement that Defendants pay Plaintiffs "one-eighth (1/8) of the price paid to Lessee per thousand cubic feet" of gas, (Leases § 4(B)), would mean Defendants need only pay royalties if a thousand-cubic-foot "group" of gas is sold. That is an absurd and unreasonable interpretation, because it would permit Defendants to sell slightly less than thousand-cubic-foot groups of gas and avoid paying royalties entirely. Defendants cannot create a latent ambiguity without contradicting the plain meaning of the text, let alone establish their preferred absurd and unreasonable interpretation as unambiguous. *See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 96 (3d Cir. 2001).

In sum, because the unitization clauses are ambiguous as to whether the well density requirement applies to the Wootten North Unit, Defendants' Motions to Dismiss will be denied as to Plaintiffs' claims for breach of the unitization and habendum clauses.

**C. Royalties**

The final issue is Equinor's practice of selling gas to its affiliate, ENG, and whether it violates the express terms of the royalty clauses or the implied covenant of good faith and fair dealing. A brief procedural digression is necessary here. While the leases' terms and the implied covenant present different legal *theories* for breach, both are the basis for a single *claim* for breach of contract. *See Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011). Counts of a complaint that allege separate legal theories for the same claim for relief should not be dismissed as duplicative, as Federal Rule of Civil Procedure 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones." *See Zidek v. Analgesic Healthcare, Inc.*, No. 13 C 7742, 2014 WL 2566527, at *2 (N.D. Ill.

June 6, 2014). *Contra Simmons*, 788 F. Supp. 2d at 410 (dismissing a count of the complaint alleging breach of the implied covenant of good faith and fair dealing as "redundant and unnecessary" in light of other counts alleging breach of contract). As such, Plaintiffs have made "alternative statements" of their breach of contract claim, and their complaint "is sufficient if any one of [the statements] is sufficient." Fed. R. Civ. P. 8(d)(2). This in turn means that I need not address Plaintiffs' implied covenant theory if the express terms of the leases would permit Plaintiffs relief, and vice versa.

    I begin with the express terms of the leases. The royalty clauses require Equinor to "pay to the Lessor as royalty for the oil, gas, and/or coalbed methane gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marketed and used." (Leases § 4(B)). Comparing the clauses at issue to those featured in other cases, it is clear that they are "proceeds" clauses because of the phrase "price paid to Lessee." A proceeds clause sets the lessor's royalty as a percentage of the proceeds received by the lessee from the sale of oil or gas. *See, e.g.*, *Tana Oil & Gas Corp. v. Cernosek*, 188 S.W.3d 354, 360 (Tex. App. 2006); *Williams & Meyers*, *Manual of Oil and Gas Terms* 849 (a "lease providing for a royalty of a portion of the proceeds of the sale of oil or gas" is a proceeds lease). The phrase "price paid to Lessee" unambiguously pegs the royalty to the price Equinor actually receives for the gas it sells, as opposed to the market value of the gas sold. *See Canfield v. Statoil USA Onshore Props. Inc.*, No. CV 3:16-0085, 2017 WL 1078184, at *17-18 (M.D. Pa. Mar. 22, 2017) (distinguishing market value clauses from proceeds clauses); *compare Trimble v. Hope Nat. Gas Co.*, 187 S.E. 331, 335 (W. Va. 1936) (clause set royalties at "one-eighth of the money received by the Lessee from the sale of said gas" (a proceeds clause)), *with Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 372 (Tex. 2001) (clause set royalties for gas "sold or used off the premises" at "the market value at the well of one-eighth of the gas so sold or used" (a market value clause)). Thus, under the plain language of the royalty clauses, Plaintiffs are only entitled to royalties based on what Equinor receives for the gas it sells, not the market value of the gas.

11

However, Plaintiffs allege Equinor breached by selling gas at an artificially low price to its affiliate ENG, not necessarily that the "price paid" should have been the market value. This claim is usually brought as an "implied duty to market" claim. Pennsylvania recognizes this duty, which requires a lessee operating under a proceeds lease "to market the gas found 'but only at a reasonable profit[,]' taking into consideration 'the distance to market, the expense of marketing, and everything of that kind.'" *Canfield*, 2017 WL 1078184, at *22 (quoting *Iams v. Carnegie Nat. Gas Co.,* 45 A. 54, 54 (Pa. 1899)). Texas imposes a similar duty on lessees. *See, e.g.*, *Union Pac. Res. Grp., Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003) ("[A] lessee under a proceeds lease has 'an obligation to obtain the best current price reasonably available[.]'" (quotation omitted)). The essence of the duty to market is that the lessee must exercise its business judgment in good faith, acting as a reasonably prudent operator would. *See Canfield*, 2017 WL 1078184, at *23-24 (predicting the good faith judgment standard applicable to habendum clauses "would likely apply to the implied duty to market"). Thus "[u]nder some circumstances, a reasonable marketer may sell gas for more or less than market value," *Hankins*, 111 S.W.3d at 74; however, "failure to sell at market value may be relevant evidence of a breach of the covenant to market in good faith," *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 373-74 (Tex. 2001) (quotation omitted). *See, e.g.*, *Anderson Living Trust v. WPX Energy Prod., LLC*, 312 F.R.D. 620, 653 (D.N.M. 2015) ("[C]ourts facing situations in which a lessee sells hydrocarbons in non-arm's length transactions typically conclude that the lessee did not behave as a reasonably prudent operator unless it sold the hydrocarbons for the highest obtainable price.").

Equinor notes that the leases provide "no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties." (Leases § 20). But, the royalty clauses state that royalties are to be paid on gas "*marketed* and used off the premises." (*Id.* § 4(B) (emphasis added)). Plaintiffs argue they have proffered a reasonable interpretation of that phrase which incorporates the implied duty to market as an express obligation. Plaintiffs use the word "marketed" as their textual hook in a bid to establish a latent, if not patent, ambiguity. Their interpretation boils down to this: the gas that the lessee

12

sells is supposed to be "marketed" by the lessee rather than an affiliate, and the word "marketed" means brought "downstream" in marketable form to the "point of sale." (*See* Doc. 42 at 24-30).

Plaintiffs' interpretation is reasonable. Section 6 of the leases, for example, provides for a "shut in" royalty "[i]n the event a well drilled hereunder is a producing well and the Lessee is unable to market the production therefrom[.]" (Leases § 6). That provision presumes the lessee—defined in the leases as a single party, Magnum Land Services—is marketing the gas produced from the lessor's land. And "marketing" must mean something more than simply "selling" gas, because Section 6 distinguishes between the two. (*Id.* (employing the phrase "marketed and sold off the premises")); *see Riverside Sch. Dist. v. Career Tech. Ctr. Of Lackawanna Cty.*, 104 A.3d 73, 76 (Pa. Commw. Ct. 2014) (courts should avoid treating contractual provisions as surplusage or redundant if reasonably possible). To Plaintiffs' credit, the original leases—without the post-production cost deduction provisions crossed out—calculated royalties by what is called the "net-back method." *Kilmer v. Elexco Land Servs.*, 990 A.2d 1147, 1149-50 (Pa. 2010). The goal of that method "is to determine the value of the gas [at the wellhead] by deducting from the sales price the costs of getting the natural gas from the wellhead to the market." *Id.* at 1149 (footnote omitted). The lease in *Kilmer*, for instance, provided: "Lessor shall receive as its royalty one eighth (1/8th) of the sales proceeds actually received by Lessee from the sale of such production, less this same percentage share of all Post Production Costs[.]" *Id.* at 1150. To "market" under Plaintiffs' leases may well mean to incur post-production costs to prepare gas for sale, based on the fact that the original parties crossed out the language "less or net any post production costs paid by the Lessee to prepare for and/or deliver the [gas] for sale[,]" but retained the marketing language. This understanding of "marketed" would impose on Equinor a duty to reduce gas to marketable form and sell it at a price higher than it would command "at the wellhead"—or, a duty to market. Supporting that understanding is the fact that the leases appear to equate "marketed and used off the premises" (Leases § 4(B)) with "marketed and *sold* off the premises (*id.* § 6 (emphasis

added)), and gas transferred at the wellhead to an affiliate is not sold "off the premises." Finally, Plaintiffs' interpretation avoids the absurd and unreasonable result that Equinor could sell gas to ENG for a nominal fee and still comply with the leases. *See W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F. Supp. 2d 790, 804 (S.D.W. Va. 2013).

Equinor maintains that the leases are unambiguous: there is no duty to market. As noted before, the leases purport to disclaim all implied covenants and obligations. Interpreting the royalty clauses to include an express duty to market arguably circumvents that disclaimer. *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986). Nor did the parties include express duty to market language, like the kind the Texas Supreme Court suggested in *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 699 n.3 (Tex. 2008) ("Lessee covenants and agrees to use reasonable diligence to produce, utilize, or market the minerals capable of being produced from said wells[.]"). And the language requiring royalties to be paid on gas "marketed and used off the premises" does not necessarily require that gas be so marketed and used—Section 14 of the leases allows Equinor to use gas on the premises for operations, for instance (*see* Leases § 14). *See Gates v. EXCO Res. (PA), Inc.*, No. CIV.A. 07-104 E, 2010 WL 1416740, at *11 (W.D. Pa. Apr. 8, 2010) (holding lessee did not owe lessor royalties on gas used to operate a compressor because it was not "gas marketed and used off the premises"); *McGraw Oil & Gas Co. v. Kennedy*, 64 S.E. 1027, 1029 (W. Va. 1909) ("That clause in the lease by which the lessees were to pay $200 yearly for each gas well 'the product from which is marketed and used off the premises' . . . is not a stipulation to market or give up."). All this, in Equinor's view, corroborates its point that "marketed and used off the premises" merely describes the class of gas that is subject to royalty payments, but does not prescribe the manner in which payments are calculated or create any duties. (Doc. 38 at 21).

That could be the case, but I am not convinced at this early stage that the royalty clauses are unambiguous in the way Equinor suggests. I am mindful that oil and gas leases are laden with terms of art and that my "linguistic field of expertise" may not overlap with the parties'. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 n.12 (3d

Cir. 1980). Courts are better positioned to tease out ambiguities on summary judgment. *See id.* ("extrinsic evidence and legal briefing are useful" in explaining the unique "linguistic frame of reference" of contractual parties). Accordingly, for now, it is enough to say that Plaintiffs have proffered a reasonable interpretation of the royalty clauses, and that Equinor has not established that the clauses are unambiguous. That entitles Plaintiffs to pursue their breach of contract claims and permits both sides to muster evidence in support of their interpretations through discovery. Furthermore, because Plaintiffs have stated their breach of contract claims using the express terms of the leases, I need not address their implied covenant of good faith and fair dealing theory.

## IV. Conclusion

For the above stated reasons, Defendants' Motions to Dismiss will be denied.

An appropriate order follows.

January 14, 2019  /s/ A. Richard Caputo
Date  A. Richard Caputo
United States District Judge