## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM A. CHAMBERS, et al.,

              Plaintiffs,

    v.

EQUINOR USA
ONSHORE PROPERTIES INC.,

           Defendant.

CIVIL ACTION NO. 3:18-CV-00437

(MEHALCHICK, J.)[1]

## <u>MEMORANDUM</u>

Before the Court are cross motions for summary judgment filed by Defendant Equinor USA Onshore Properties, Inc. ("Defendant EOP") and Plaintiffs Joseph A. Chambers, William A. Chambers, Daniel Loren Day, Jeanne C. Faux, Barbara C. Henning, Samantha Scholz, John D. Witter, and Richard W. Witter (collectively, "Plaintiffs"). (Doc. 105; Doc. 112). Plaintiffs initiated this action by filing a complaint in the Court of Common Pleas of Wyoming County, Pennsylvania against Defendant EOP and Defendant Chesapeake Appalachia, L.L.C. ("Defendant Chesapeake"). (Doc. 1-1, at 7-84). On February 2, 2018, Defendant Chesapeake removed this case to this Court pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446. (Doc. 1). On August 31, 2018, Plaintiffs filed the operative second amended complaint against Defendant EOP and Defendant Chesapeake.[2] (Doc. 30). For the reasons set forth herein, Plaintiffs' motion for summary judgment will be **DENIED** and Defendant

---

[1] This matter was reassigned to the undersigned District Judge on February 12, 2024.

[2] On February 28, 2024, Chesapeake was terminated from this action.

EOP's motion for summary judgment will be **DENIED in part** and **GRANTED in part**. (Doc. 105; Doc. 112).

## I.   BACKGROUND AND PROCEDURAL HISTORY

The following factual background is taken from the parties' statements of material facts and answers thereto.[3] (Doc. 105-2; Doc. 110; Doc. 119; Doc. 120-1). The Plaintiffs in this case are Pennsylvania landowner-lessors under oil and gas leases ("the Leases"). (Doc. 105-2, ¶ 1; Doc. 110, at ¶ 1). Defendant EOP is a Houston based oil and gas production company that owns an interest in the Leases. (Doc. 105-2, ¶ 2; Doc. 110, ¶ 2). The Leases were originally entered into with Plaintiffs and/or their assignees and Magnum Land Services, LLC ("Magnum"), a Michigan based company. (Doc. 105-2, ¶ 1; Doc 110, ¶¶ 11; Doc. 119, ¶ 1). Defendant EOP took no part in negotiating the Leases and acquired its interests in them through a series of sales and assignments.[4] (Doc. 105-2, ¶ 2; Doc. 110, ¶¶ 11-17, 45; Doc. 19, ¶ 2; Doc. 120-1).

At issue in this case is royalty payments paid by Defendant EOP to Plaintiffs based on oil and gas sales. The controlling royalty clause in the Leases reads:

> To pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas marketed and uses off the premises and produced from each well drilled thereon, the sum of one eight r(1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marked and used. . .

(Doc. 105-2, ¶ 3; Doc. 119, ¶ 3; Doc. 30-1, at 10).

---

[3] Pursuant to Local Rule 56.1, the Court accepts as true all undisputed material facts supported by the record. Where the record evinces a disputed fact, the Court will take notice. In addition, the facts have been taken in the light most favorable to the non-moving party with respect to each motion.

[4] Defendant EOP disputes that the fact it failed to have any part in negotiating the Leases is a material fact. (Doc. 120-1, ¶ 7).

Defendant EOP transfers gas at the wellhead to a separate, but affiliated entity, Equinor Natural Gas, ("ENG") under a contract that provides for a price based on published interstate index prices.[5] (Doc. 105-2, ¶¶ 5, 7, 9, 11; Doc. 110, ¶¶ 71-74; Doc. 119, ¶¶ 5, 6, 7). Defendant EOP pays royalties to Plaintiffs based on this transfer and index price. (Doc. 105-2, ¶¶ 5, 6, 7, 9, 11; Doc. 110, ¶¶ 84-86; Doc. 119, ¶¶ 5, 6, 7; Doc. 120-1, ¶ 85). ENG then transports and sells the gas further downstream to a variety of customers, some as far away as Canada. (Doc. 105-2, ¶ 9; Doc. 119, ¶ 9). Plaintiffs do not profit from these downstream sales.

Relevant here, the original lease provided that, in paying royalties, the Lessee could deduct certain post-production costs such as the cost to gather and transport the gas from the wellhead to the pipeline index point. (Doc. 105-2, ¶ 3; Doc. 119, ¶ 3; Doc. 30-1, at 2). However, this language has since been crossed out from the Lease. (Doc. 105-2, ¶ 3; Doc. 120, ¶ 59; Doc. 119, ¶ 3; Doc. 120-1, ¶ 59; Doc. 30-1, at 2).

In their second amended complaint, Plaintiffs' assert six claims for breach of contract (Counts I-VI) against Defendant Chesapeake and Defendant EOP. (Doc. 30). On October 5, 2018, Chesapeake moved to dismiss Counts I-III. (Doc. 34). On October 5, 2018, Defendant EOP moved to dismiss all claims brought against it. (Doc. 35). On January 14, 2019, the Court denied both Defendant Chesapeake and Defendant EOP's motions to dismiss. (Doc. 35; Doc. 45). On February 27, 2019, Chesapeake and Defendant EOP each filed an answer to Plaintiffs' second amended complaint. (Doc. 50; Doc. 51).

---

[5] Defendant EOP opines that "EOP does market, or sell, gas to ENG at the wellhead." (Doc. 120-1, ¶ 72).

On July 16, 2020, Plaintiffs filed an unopposed motion to sever Count V and Count VI against Defendant EOP from the remaining claims in the second amended complaint. (Doc. 83). At this time, Defendant Chesapeake was engaged in bankruptcy proceedings. (Doc. 83). On July 20, 2020, the Court granted the motion to sever and the case proceeded to discovery on just Counts V and Count VI against Defendant EOP. (Doc. 84). Counts I-IV against Defendant Chesapeake were voluntarily dismissed with prejudice on January 6, 2021. (Doc. 90). Defendant Chesapeake was subsequently terminated from this action.

On September 18, 2021, Defendant EOP filed a motion for summary judgment, as well as a brief in support, statement of facts, and appendix of exhibits. (Doc. 105; Doc. 105-1; Doc. 105-2; Doc. 105-3). On August 13, 2021, Defendant EOP filed a motion for leave to file five exhibits under seal, which the Court granted on August 13, 2021. (Doc. 106; Doc. 111). On August 13, 2021, Plaintiffs filed a motion for leave to file a partial motion for summary judgment, a statement of material facts, and brief in support under seal which the Court granted on August 13, 2021. (Doc. 107; Doc. 108; Doc. 109; Doc. 110). On August 13, 2021, Plaintiffs filed a partial motion for summary judgment. (Doc. 112). On September 29, 2021, Plaintiffs filed a motion to file their brief in opposition to Defendant EOP's motion for summary judgment and Plaintiffs' response to Defendant EOP's statement of facts under seal, which the Court granted on September 29, 2021. (Doc. 115; Doc. 116; Doc. 117). On September 24, 2021, Defendant EOP filed a brief in opposition to Plaintiffs' motion for partial summary judgment. (Doc. 120). On October 15, 2021, the parties filed their respective reply briefs. (Doc. 121; Doc. 122). On April 5, 2024, the Court held oral argument on the pending

motions for summary judgment. (Doc. 130). Accordingly, the motions for summary judgment have been fully briefed and are now ripe for disposition.[6]

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In

---

[6] Prior to oral argument, on March 29, 2024, Defendant EOP filed a supplemental brief in support of its motion for summary judgment. (Doc. 132). On April 1, 2024, Defendant EOP filed a motion for leave to file a response to Defendants' supplemental brief, which the Court granted on April 3, 2024. (Doc. 135). On April 12, 2024, Plaintiffs filed a brief in opposition to Defendant EOP's supplemental brief in support. (Doc. 139).

deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'"[7] *Velentzas v. U.S.*, No. 4: CV-07-1255, 2010 WL 3896192, *7 (M.D. Pa. August 31, 2010) (quoting *Goode v. Nash,* 241 F. App'x 868, 868 (3d Cir. 2007)) (citation omitted). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Goode,* 241 F. App'x at 868 (internal quotation marks omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

With respect to cross-motions for summary judgment, "[e]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions." *Quarles v. Palakovich*, 736 F. Supp.

---

[7] *See also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite to particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)).

2d 941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008)). However, a federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell,* 206 F.3d at 278.

## III. DISCUSSION

The parties' cross-motions for summary judgment are premised on their dueling interpretations of the Leases. (Doc. 105-1, at 14; Doc. 118, at 17). Specifically, the parties present competing interpretations of the phrase "*marketed and used of the premise*" from the challenged royalty clauses and dispute whether Defendant EOP had an implied duty to market gas produced under the Leases to downstream third parties. (Doc. 105-1, at 15-29; Doc. 118, at 2). Under Pennsylvania law, the general principles of contract interpretation govern oil and gas leases. *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (2012) (citation omitted). "When interpreting a contract, a court must determine the intent of the parties and effect must be given to all provisions in the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (1993). "It is firmly settled that the intent of the parties to a written contract is contained in the writing itself." *Krizovensky*, 624 A.2d at 642. "While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact." *Kripp v. Kripp*, 578 Pa. 82, 849 A.2d 1159, 1163 (2004).

The Court is tasked with determining whether the Leases' royalty clauses are ambiguous and whether the Leases impose an implied duty of good faith and fair dealing on the parties. (Doc. 105-1, at 1; Doc. 118, at 2). Finding here that the language of the royalty clauses is ambiguous, and there exists no independent cause of action for breach of an implied

duty of good faith and dealing under Pennsylvania law, the Court will **DENY in part** and **GRANT in part** Defendant EOP's motion for summary judgment and **DENY** Plaintiffs' motion for summary judgment in full. (Doc. 105; Doc. 112).

A. INTERPRETATION OF THE ROYALTY CLAUSES

Plaintiffs' assert a claim for breach of contract based on affiliate transfer violations in Count V of the second amended complaint. (Doc. 30, ¶¶ 130-35). Therein Plaintiffs allege "Per the terms of the Leases, Plaintiffs' royalties must be calculated based on the actual price [Defendant EOP] receives for sale of the gas marketed and sold off the premises, including sales to end users in the premium markets that Equinor ASA touts as the most lucrative part of its gas marketing chain in North America." (Doc. 30, ¶ 132). Both parties move for summary judgment on this claim. (Doc. 105; Doc. 112). In doing so, the parties advocate for different interpretations of the royalty provisions in the Leases. (DOC. 105-1, at 15; Doc. 109, at 20). Defendant EOP argues that because it has complied with the plain language of the Leases, which required it to pay royalties based on the "price paid to the Lessee," Plaintiffs' breach of contract claim must fail as a matter of law. (Doc. 105-1, at 15). Defendant EOP supports this position by pointing to its sale of gas at the wellhead to its affiliate, ENG. (Doc. 105-1, at 15-16). Plaintiff argues that the undisputed facts in this case establish the opposite, supplying that Defendant EOP breached the Leases by paying royalties calculated on these affiliate sales at the wellhead and not ENG's sale downstream to third parties. (Doc. 109, at 20). Both parties support their positions with their respective interpretations of the Leases. (Doc. 105-1, at 15-16; Doc. 109, at 20).

The Leases' royalty provision requires Defendant EOP:

> To pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas *marked and used off the premises* and produced from each well drilled thereon, the sum of one eight (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marked and used . . . Payment of royalty for oil, gas, and/or coalbed methane gas marketed during any calendar month to be on or about the 60th day after receipt of such funds by the Lessee.

(Doc. 30-2, at 10; Doc. 105-2, at 3, ¶ 4; Doc. 110, at 13-14, ¶ 50-51).

The parties dispute how the "*marked and used off the premise*s" phrase is properly interpreted. (Doc. 30-2, at 10; Doc. 105-1, at 15; Doc. 122, at 7-8).

To begin, the Court must again consider whether the language of the Leases is ambiguous, this time with the benefit of discovery. *See Chambers*, 359 F. Supp. 3d at 281 ("I am not convinced at this early stage that the royalty clauses are unambiguous in the way Equinor suggests. I am mindful that oil and gas leases are laden with terms of art and that my "linguistic field of expertise" may not overlap with the parties'. Courts are better positioned to tease out ambiguities on summary judgment." (citations omitted)). Summary judgment on an issue of contract interpretation is only appropriate where "the contract is so clear that it can be read only one way." *Allied Erecting & Dismantling Co., Inc. v. USX Corp.*, 249 F.3d 191, 201 (3d Cir. 2001); *see Tennant*, 561 F. Supp. 3d at 531. While the Court may interpret unambiguous portions of an oil and gas lease, ambiguous portions must be submitted to the fact finder. *Tennant v. Range Res. - Appalachia, LLC*, 561 F. Supp. 3d 522, 530 (W.D. Pa. 2021). "To be 'unambiguous,' a contract clause must be reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192,

519 A.2d 385, 390 (1986); *see also Slamon v. Carrizo (Marcellus) LLC*, 654 F. Supp. 3d 405, 424 (M.D. Pa. 2023). When determining whether a contract is ambiguous, courts consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011). "'The accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement.'" *Penneco Pipeline Corp. v. Dominion Transmission, Inc.*, No. CIVA 05-49, 2007 WL 1847391 (W.D. Pa. June 25, 2007), *aff'd*, 300 F. App'x 186 (3d Cir. 2008) (quoting *Willison v. Consolidation Coal Co.*, 536 Pa. 49, 637 A.2d 979, 982 (1994))). Furthermore, "[i]f left undefined, the words of a contract are to be given their ordinary meaning." *Kripp*, 849 A.2d 1159 at 1163. To determine this "ordinary meaning," "Pennsylvania courts may consult dictionary definitions[.]" *Slamon*, 654 F. Supp. 3d at 425 (citing *True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 339 (Pa. Super. 2016)). This considered, when interpreting oil and gas production leases, courts typically defer to the historical understanding of the terms used, prior judicial decisions, and experts in the oil and gas field to interpret the lease terminology. *See Wiser v. Enervest Operating, L.L.C.*, 803 F. Supp. 2d 109, 117 (N.D.N.Y. 2011) (stating "an understanding of the development of the industry is critical when construing the terms of an oil and gas lease" because such leases "are made in the context of a highly technical industry, which employs distinct terminology used by those in the business"); *cf. Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 764 (W.D. Pa. 2004) ("Instruments conveying property rights in minerals such as oil and gas are executed in the context of an industry that is highly technical in nature and employs district terminology used by those

involved in the business."). "An understanding of the historical development of the industry is essential in making an informed assessment concerning the intent of the parties in employing the language utilized in a particular instrument." *Jacobs*, 332 F. Supp. 2d at764; *see Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa. Super. 14, 473 A.2d 584, 592 (1984).

Considering the nuanced and technical nature of the language now before it, this Court finds the disputed "*marketed and used off the premises,*" wording "is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison*, 519 A.2d at 390. The historic usage of the clause "*marketed and used off the premises,*" the record, caselaw, the term "marketed's" ordinary meaning, and the absence of expert testimony supports this Court's finding that there are multiple interpretations of the royalty clause that could be reasonable in this case. Accordingly, the Court finds the ambiguities before it are better resolved by a finder of fact.

As pointed out by Defendant EOP, the challenged "*marketed and used off the premises*" wording was "adopted over 100 years ago in oil and gas leases and has always been understood to delineate merely whether any royalty was owed at all." (Doc. 105-1, at 16); *see Yoke v. Shay*, 47 W.Va. 40, 34 S.E. 748, 749 (1899); *see also J.K. Willison, Jr. v. Consolidation Coal Co.*, 637 A.2d 979 (Pa. 1994). Defendant EOP avers, "in cases dating back a century, [courts] did not suggest that the reference to 'marketed' was intended to impose a duty to market the gas." (Doc. 105-1, at 16). Plaintiffs respond to these averments by highlighting the fact that the meaning of the terminology in oil and gas leases has changed substantially throughout the years and indicating that there has yet to be a court tasked with analyzing the royalty language as it relates to the Leases in this case. (Doc. 122, at 9); *see Venture Oil Co. v.*

*Fretts*, 152 Pa. 451, 25 A. 732 (1893) (an agreement for the production of oil and gas must be construed both with reference to the known practices within the industry and the evident intention of the parties). Plaintiffs point to the fact that "the gas industry changed significantly following deregulation in the 1980s" and that "[g]as is no longer sold at the wellhead; rather, it is now marketed in downstream pipelines" in making this point. (Doc. 122, at 9); *see Kilmer v. Elexco Land Servs.*, 990 A.2d 1147, 1149 (Pa. 2010); *cf Roe v. Chief Expl. & Dev. LLC*, No. 4:11-CV-00579, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013) (discussing changes to the oil and gas industry throughout history in addressing a claim requiring contract interpretation) Accordingly, as Plaintiffs see it, history cannot be used to tease out of ambiguities in this case. (Doc. 122, at 7-9). For the purposes of the instant motions, the Court agrees, finding expert testimony on the historical significance of these terms in the present Leases would be useful in determining the proper interpretation of the challenged clause.

Beyond the historical underpinnings of the terminology at issue, the record fails to support a conclusive interpretation of the "*marketed and used of the premises*" language. This Court previously permitted the parties "to muster evidence in support of their interpretations through discovery." *Chambers*, 359 F. Supp. 3d at 281. However, neither party has enlisted an expert from the oil and gas industry to testify in support of their dueling interpretations of the Leases. (Doc. 105-1, at 22). While Defendant EOP mainly cites to caselaw in support of its interpretation of the Leases,[8] Plaintiffs submit that "the record shows that [Defendant] EOP's

---

[8] Without citing to caselaw, Defendant EOP also asserts that Plaintiffs' reliance on parol evidence, particularly evidence that Defendant EOP was not involved in negotiating the Leases, is improper and has been "consistently rejected" by courts when interpreting oil and gas leases. (Doc. 121, at 6)

own understanding and division of 'production' and 'marketing' functions, with the former occurring 'on the premises' and the latter 'off the premises,' demonstrate the EOP's royalty scheme does not comply the intent of the Leases." (Doc. 105-1, at 19-21; Doc. 121, at 7-11; Doc. 139, at 12; Doc. 140 at 30). Plaintiffs aver that the "evidence [in this case] shows that EOP's purported plain language interpretation is 'unreasonable and absurd.'" (Doc. 122, at 10).

Specifically, Plaintiffs point to the testimony of Defendant EOP's corporate designee, Mary Fry. (Doc. 110-4). Ms. Fry testified to the separate natures of Defendant EOP and ENG, explaining that ENG works in "the marketing segment" of parent company Equinor and that its function is to take gas "from the wellhead and move it downstream of the wellhead." (Doc. 110-4, at 9). Ms. Fry also testified that it is her understanding that Leases are proceeds leases, meaning the lessee is to be paid on the proceeds from the gas sold. (Doc. 110-4, at 7, 12). However, it is not the proceeds from the sale of the marketed gas that determine Plaintiffs' royalties, but the index prices paid by ENG to transfer title of the oil and gas from Defendant EOP. (Doc. 110-4, at 7, 12). These index prices are intended to reflect the market value of gas at the wellhead for the purpose of valuing the transfer of title to the gas from Defendant EOP to ENG. (Doc. 110-4, at 7, 12).

Plaintiffs interpret this testimony and Equinor's vertical business structure to suggest that while "Defendant EOP does nothing to market Plaintiffs' gas," off the premises, it is "undisputed that Defendant EOP understands the term 'marketing' to mean downstream advertising." ((Doc. 109, at 25-26; Doc. 110, ¶¶ 71-79, 98; Doc. 118, at 24-25; Doc. 122, at 20; Doc. 140, at 24). Accordingly, Plaintiffs complain that Defendant EOP adopts a new, advantageous interpretation of the term to defend their calculation royalties based on affiliate

transfers at the wellhead. (Doc. 109, at 25-26; Doc. 110, ¶¶ 71-79, 98; Doc. 118, at 24-25; Doc. 140, at 24).

Pointing to the Leases themselves, Plaintiffs similarly argue "marketing is distinguished from production in the same way [Defendant] EOP and ENG distinguish ENG's marketing from the EOP's production on the premises." (Doc. 118, at 25; Doc. 139, at 7). This Court recognized as much in addressing Defendant EOP's motion to dismiss. *See Chambers*, 359 F. Supp. 3d at 280. In finding Plaintiff's interpretation of the Leases reasonable, this Court noted:

> To "market" under Plaintiffs' leases may well mean to incur post-production costs to prepare gas for sale, based on the fact that the original parties crossed out the language "less or net any post production costs paid by the Lessee to prepare for and/or deliver the [gas] for sale[,]" but retained the marketing language. This understanding of "marketed" would impose on Equinor a duty to reduce gas to marketable form and sell it at a price higher than it would command "at the wellhead"—or, a duty to market. Supporting that understanding is the fact that the leases appear to equate "marketed and used off the premises" (Leases § 4(B)) with "marketed and *sold* off the premises (*id.* § 6 (emphasis added)), and gas transferred at the wellhead to an affiliate is not sold "off the premises."

*See Chambers*, 359 F. Supp. 3d at 280.

Also, as previously realized by this Court, the instant Leases are proceeds leases, meaning they provide for a royalty of a portion of the proceeds of the sale of oil or gas. (Doc. 110-2; Doc. 110-4, at 7); *Chambers*, 359 F. Supp. 3d at 279 ("The phrase "price paid to Lessee" unambiguously pegs the royalty to the price [Defendant EOP] actually receives for the gas it sells, as opposed to the market value of the gas sold."); *see also Williams & Meyers, Manual of Oil and Gas Terms* 849 ("a "lease providing for a royalty of a portion of the proceeds of the sale of oil or gas is a proceeds lease"). As this Court has stated before, "under the plain language

14

of the royalty clauses, Plaintiffs are only entitled to royalties based on what [Defendant EOP] receives for the gas it sells, not the market value of the gas." (Doc. 110-2); *Chambers*, 359 F. Supp. 3d at 279. Through Ms. Fr's testimony, the record reflects that Defendant EOP acknowledges that the market value used to calculate the index prices differs from the proceeds of the sale of oil and gas under the Leases, as it may be higher or lower than what the oil and gas actually sells for. (Doc. 110-4, at 7). Thus, as argued by Plaintiffs, it appears that the construction Defendant EOP's is offering fails to give effect to the Leases as proceeds leases, instead allowing Defendant EOP to base its royalty calculations on the market value of the gas through the 100% transfer to its affiliate ENG. (Doc. 122, at 21; Doc. 140 at 32).

Even so, the Court acknowledges that several other courts, mainly in Ohio, have adopted Defendant EOP's perspective and interpreted the term "marketing" to mean sold in this context. For example, Defendant EOP directs the Court's attention to *Gateway Royalty, LLC v. Chesapeake Exploration*. (Doc. 105-1, at 19; Doc. 121, at 7); No. 19 CA 0933, 2020 WL 1671626, at *4-5 (Ohio Ct. App. Apr. 3, 2020). In *Gateway Royalty,* the Court of Appeals for Ohio reviewed a lease provision containing similar "*marketed and used off the premises*" language as that at bar to determine whether defendant oil and gas company was underpaying royalties by deducting post-production costs from downstream sales of gas. 2020 WL 1671626, at *4-5. The court rejected the plaintiffs' argument that by definition, "marketing" must occur off the premise and found that the defendant "marketed" the gas when it transferred title to another entity affiliated with defendant, at the wellhead. *Gateway Royalty*, 2020 WL 1671626, at *4-5. The court stated, "[a]ccording to Merriam-Webster's online dictionary, to "market" is "to expose for sale in a market" or to "sell." https://www.merriam-webster.com/dictionary/market. Thus, when [Defendant] sold the gas and NGLs to [its

affiliate], it "marketed" the product. Because there is no ambiguity, we will not consider the extrinsic documents that Gateway relies on." *Gateway Royalty*, 2020 WL 1671626, at *4. Plaintiffs argue *Gateway Royalty* is distinguishable because "the language in that case was fundamentally different—unlike the leases at issue in *Gateway*, there is no ability for [Defendant] EOP to deduct post-production costs under the Leases for the proceeds realized from downstream sales." (Doc. 118, at 28); 2020 WL 1671626. This is true given the crossed-out language in the Leases. (Doc. 110-2, at 2). Plaintiffs also correctly highlight the fact that the *Gateway Royalty* court did not consider whether there was a contractual duty to market the gas under the challenged lease provisions. (Doc. 118, at 28); 2020 WL 1671626. Still, in another case while reviewing similar lease provisions, the Sixth Circuit again concluded: "[t]he definition of 'market' is 'to expose for sale in a market' or to 'sell,' which is what happens when [Defendant] sells oil and gas to [Affiliate Marketing Company]." *Henceroth v. Chesapeake Expl., LLC,* 814 F. App'x 67, 71 (6th Cir. 2020) (internal citations omitted).

A Pennsylvania arbitrator found the same interpretation of "marketed" to be reasonable. *See Ostroski v. Chesapeake Appalachia, L.L.C.*, No. 2:18CV947, 2019 WL 6118353, at *3 (W.D. Pa. Nov. 18, 2019). More precisely, the arbitrator found that the language "marketed and sold" in a royalty provision of an oil and gas lease does not impose a duty to market and even if it did, defendant's sale to an affiliated marketing company satisfies the requirement. *Ostroski*, 2019 WL 6118353, at *3. The district court affirmed the arbitrator's decision.[9] *Ostroski*, 2019 WL 6118353, at *3. In disputing the relevance of this case, Plaintiffs

---

[9] Notably, in *Ostroski v. Chesapeake Appalachia, L.L.C.*, the Western District of Pennsylvania did not review the merits of the arbitrator's decision and was not tasked with

note the "highly deferential standard applicable in such proceedings," contending the case "is hardly the ringing judicial endorsement of the merits of the arbitrator's decision [Defendant] EOP makes it out to be." (Doc. 118, at 29). While the Court finds the aforementioned cases to be compelling, no similar guidance has come from the Third Circuit, and no court has been tasked with deciphering the instant clauses in the context of the specific Leases at bar. Further, no court has considered the relevance of the contracting parties' decision to strike the post-production language from the royalty clauses. Accordingly, the Court cannot find that these cases force a decision on the language before it.

The Court finds the dictionary similarly unhelpful for purposes of determining whether summary judgment should be granted. As the *Gateway Royalty* court pointed out, the verb "market" is defined by Merriam Webster Dictionary as "to expose for sale in a market."*Market*, Merriam Webster Dictionary, https://www.merriam-webster.com;  2020 WL 1671626, at *4. Merriam Webster Dictionary defines "marketing" to mean both "the act or process of selling or purchasing in a market" and "the process or technique of promoting, selling, and distributing a product or service." *Marketing*, Merriam Webster Dictionary, https://www.merriam-webster.com. "Marketing" is defined in Black's Law Dictionary as "[t]he act or process of promoting and selling, leasing, or licensing products or services." *Marketing*, Black's Law Dictionary (11th ed. 2019). These definitions could be used to support both Plaintiffs and Defendant EOP's interpretation of the "*marketing and used off the premises*" language.

---

correcting factual or legal errors. 2019 WL 6118353, at *3. Instead, the court reviewed the decision for "manifest disregard" for the lease. 2019 WL 6118353, at *3.

Considering these concerns and the lack of expert testimony from someone in the oil and gas industry knowledgeable about the types of leases now at issue, the Court cannot conclude the "*marketed and used off the premises*" language in the royalty clauses of the Leases is "so clear" "that it can be read only one way."[10] *Tennant*, 561 F. Supp. 3d at 531. The Court finds this language to be ambiguous such that a finder of fact would be better suited to make a determination regarding its interpretation. Summary judgment is therefore **DENIED** as to Count V of the second amended complaint. (Doc. 105; Doc. 112).

B. IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Both parties assert they are entitled to summary judgment on Plaintiffs' breach of an implied duty of good faith and fair dealing claim, Count VI of the second amended complaint. (Doc. 30, at 35; Doc. 105-1, at 27-28; Doc. 102, at 32). Plaintiffs allege Defendant EOP "abused its discretion and breached the duty of good faith and fair dealing by using affiliate transfers as part of a scheme to benefit itself and its parent company at Plaintiffs' expense." (Doc. 30, ¶ 138). The Third Circuit has held that "an independent cause of action for breach of a duty of good faith and fair dealing" is recognized "only in very limited circumstances" such as "insurers' dealings with insureds, franchisors' dealing with franchisees and other narrow situations." *Slamon*, 654 F. Supp. 3d at 438 (citing *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000) (citing *Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co.*, 560 A.2d 151, 153, 154 (1989)). Outside of those narrow circumstances, a breach of an implied duty claim may only be used as an "interpretive tool"

---

[10] This Court also concluded: "Plaintiffs' interpretation avoids the absurd and unreasonable result that [Defendant EOP] could sell gas to ENG for a nominal fee and still comply with the leases." *See Chambers*, 359 F. Supp. 3d at 280.

in addressing a breach of contract claim and to "color" the express terms of the contract at issue. *See Northview Motors,* 227 F.3d at 91.

Defendant EOP argues that under Pennsylvania law, there is no legal basis to assert a claim for violation of the duty of good faith and fair dealing and that "the duty of good faith does not create an independent duty under the contract; it merely operates as an interpretive tool to determine the parties' intent and justifiable expectations under the express provisions of the contract." (Doc. 105-1, at 28); *see Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 (3d Cir. 1995). Plaintiffs maintain that Defendant EOP violated the duty of good faith and fair dealing through "evasion of the spirit of the bargain reflected in the language of the leases." (Doc. 109, at 30).

This claim is easily resolved, as Pennsylvania does not recognize a separate cause of action for breach of an implied duty of good faith and fair dealing in oil and gas leases. *Engstrom v. John Nuveen & Co.*, 668 F. Supp. 953, 958 (E.D. Pa. 1987). "[A]n alleged breach of the duty of good faith and fair dealing is construed as a breach of contract claim." *David v. Neumann Univ.*, 187 F. Supp. 3d 554, 561 (E.D. Pa. 2016); *see Sargent v. SWEPI LP*, No. 4:19-CV-1896, 2020 WL 1503222, at *2 (M.D. Pa. Mar. 24, 2020) ("plaintiffs['] claim for breach of the implied covenant of good faith and fair dealing [cannot] 'trump the express provisions of the contract' at issue."); *see also Canfield v. Statoil USA Onshore Properties Inc.*, No. CV 3:16-0085, 2017 WL 1078184, at *21 (M.D. Pa. Mar. 22, 2017) ("The Pennsylvania Supreme Court has not addressed whether an implied duty of good faith is imposed on all contracts or whether it should be applied to oil and gas leases, specifically."). "Pennsylvania currently recognizes three implied covenants in oil and gas leases: (1) an implied duty to reasonably develop the land; (2) an implied duty to protect the land from drainage due to adjoining

operations; and (3) an implied duty to bring extracted gas to market." [11] *Canfield*, 2017 WL 1078184, at *21. Furthermore, Plaintiffs are not "entitled to maintain an implied duty of good faith claims where the allegations of bad faith are identical to a claim for relief under an established cause of action." *Northview Motors, Inc., v. Chrysler Motors Corp.*, 227 F.3d 78, 91-92 (3d Cir. 2000). There is no "separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011); *see also Lomma v. Ohio Nat'l Life Assurance Corp.*, 329 F. Supp. 3d 78, 96 (M.D. Pa. 2018) (concluding that a where a breach of contract claim and breach of covenant of good faith claim were based on the same conduct, "the latter [could not] withstand summary judgment").

Plaintiffs' breach of contract claim as pled in Count V of their second amended complaint subsumes their breach of an implied duty of good faith and fair dealing claim as pled in Count VI because both claims complain of the same behavior: basing royalty payments on transfer to an affiliate marketing company, ENG, instead of downstream sales. (Doc. 30, at ¶¶ 130-134, 135-146). This, combined with the fact that Pennsylvania does not recognize a separate cause of action for breach of an implied duty of good faith and fair dealing in this context indicates that Count VI fails as a matter of law. Accordingly, the Court will **GRANT** Defendant EOP's motion for summary judgment as to Count VI and allow this case to

---

[11] The Court need not address the disclaimer of implied duties in the Leases. (Doc. 110-2, at 18). "Pennsylvania courts do not appear to have passed on the issue of whether, under the common law, the implied covenant of good faith and fair dealing may be waived or disclaimed by agreement[.]" *Masciantonio v. SWEPI LP*, No. 4:13-CV-0797, 2014 WL 4441214, at *14 (M.D. Pa. Sept. 9, 2014). However, because the Court will dismiss Plaintiffs' claim for a breach of an implied duty of good faith and dealing claim, it need not make a decision on this basis.

proceed on Plaintiffs' breach of contract claim as stated in Count V. (Doc. 105); *see Obermayer, Rebmann, Maxwell & Hippel, LLP v. J.P. Mascaro & Sons*, 277 A.3d 1142, at *2 (Pa. Super. Ct. 2022) ("[a] claim for breach of the covenant of good faith and fair dealing is subsumed in a breach of contract action is not itself an independent cause of action.") (citing *LSI Title Agency, Inc. v. Evaluation Servs.*, 951 A.2d 384, 391-92 (Pa. Super. Ct. 2008)); *see also Stewart v. SWEPI, LP*, 918 F. Supp. 2d 333 (M.D. Pa. 2013) ("Pennsylvania law does not recognize a separate cause of action for breach of the covenant 'because such a breach is merely a breach of contract.'" (quoting Z*aloga v. Provident Life and Accident Ins. Co. of America*, 671 F.Supp.2d 623, 631 (M.D. Pa. 2009)). Plaintiffs' motion for summary judgment as it relates to Count VI is **DENIED**. (Doc. 112).

## IV. CONCLUSION

For the reasons set forth herein:

1. Defendant EOP's motion for summary judgment (Doc. 105) is **DENIED in part and GRANTED in part**;

2. Plaintiffs' motion for summary judgment (Doc. 112) is **DENIED**;

3. COUNT VI of the second amended complaint (Doc. 30, ¶¶ 136-46) is **DISMISSED with prejudice.**

An appropriate Order follows.

Dated: September 6, 2024

*Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**